# 13-3741

# United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee-Respondent*,

v.

APPLE INC.,

*Appellant-Movant.*

On Appeal from the United States District Court
for the Southern District of New York
Nos. 12-02826 & 12-03394 (DLC)

## EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, D.C.  20036
(202) 955-8500

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
(213) 229-7804
tboutrous@gibsondunn.com

*Attorneys for Appellant Apple Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendant-appellant states the following:

Apple Inc. has no parent corporation.  To the best of Apple Inc.'s knowledge and belief, and based on publicly filed disclosures, as of January 17, 2014, no publicly held corporation owns 10% or more of Apple Inc.'s stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 3

LEGAL STANDARD ........................................................... 7

ARGUMENT ................................................................... 8

I.    Apple Is Likely to Succeed on Appeal ........................................ 8

    A.    The Monitor's Investigation Surpasses the Limits of Rule 53 and Violates the Constitutional Separation of Powers ........................ 9

    B.    The Monitor Must at the Very Least Be Disqualified ..................... 14

II.   Apple Will Suffer Irreparable Harm Absent a Stay .................................. 17

III.  A Stay of the Injunction Will Not Harm Plaintiffs or the Public Interest ................................................................. 20

CONCLUSION ................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Benjamin v. Fraser,*
  343 F.3d 35 (2d Cir. 2003) ...................................................9

*Brenntag Int'l Chems., Inc. v. Bank of India,*
  175 F.3d 245 (2d Cir. 1999) .................................... 2, 8, 18

*Caiozzo v. Koreman,*
  581 F.3d 63 (2d Cir. 2009) ...................................................9

*Caperton v. A.T. Massey Coal Co., Inc.,*
  556 U.S. 868 (2009) ..........................................................15

*CFTC v. Schor,*
  478 U.S. 833 (1986) ..........................................................13

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
  645 F.3d 114 (2d Cir. 2011) ...............................................10

*Cobell v. Norton,*
  334 F.3d 1128 (D.C. Cir. 2003)................................. 3, 9, 10, 12, 16, 19

*Hilton v. Braunskill,*
  481 U.S. 770 (1987) ............................................................8

*In re Peterson,*
  253 U.S. 300 (1920) ............................................................9

*Juan F. v. Weicker,*
  37 F.3d 874 (2d Cir. 1994) .................................................10

*La Buy v. Howes Leather Co.,*
  352 U.S. 249 (1957) ............................................................9

*Liljeberg v. Health Servs. Acquisition Corp.,*
  486 U.S. 847 (1988) ..........................................................15

*Lister v. Commr's Court,*
  566 F.2d 490 (5th Cir. 1978)..............................................15

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...................................................................12

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................... 8, 17

*Philip Morris USA, Inc. v. Scott*,
  131 S. Ct. 1 (2010)......................................................................18

*Reed v. Rhodes*,
  691 F.2d 266 (6th Cir. 1982) ......................................................9

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ......................................................20

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) .................................................20

*Ruiz v. Estelle*,
  679 F.2d 1115 (5th Cir. 1982) ...................................................12

*United States v. ITT Cont'l Baking Co.*,
  420 U.S. 223 (1975) ...................................................................10

*United States v. Microsoft*,
  231 F. Supp. 2d 144 (D.D.C. 2002) ............................................9

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009).................................................10

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ............................................................ 12, 17

## Statutes

28 U.S.C. § 455.............................................................................15

28 U.S.C. § 455(a) .................................................................. 14, 16

28 U.S.C. § 455(b)(1).............................................................. 14, 15

28 U.S.C.§ 455(b)(4).............................................................. 14, 16

## Rules

Fed. R. Civ. P. 53(a)(1)(C) ...................................................................8, 9

Fed. R. Civ. P. 53(a)(2)........................................................................14

## Constitution

U.S. Const. art. III, § 1 .........................................................................12

Defendant-appellant Apple Inc. moves this Court pursuant to Federal Rule of Appellate Procedure 8(a) for an emergency stay pending appeal of section VI of the permanent injunction entered by the district court and all related proceedings. Apple requests that the Court rule on this motion before January 21, 2014, at 12:00 p.m. ET, when the district court's temporary stay will be lifted, or grant an immediate administrative stay while it considers Apple's motion and plaintiffs' opposition. Apple notified plaintiffs of this motion, and they intend to oppose it.

## INTRODUCTION

This is the first case in which a court has imposed a monitor on a party, over its objection, in a litigated civil antitrust case. The court has vested the monitor with extremely broad and extrajudicial powers: the right to communicate *ex parte* with the parties and to engage in investigatory, inquisitorial activities that far exceed the traditional role and powers of a judicial officer. The monitor's stated objectives are to "crawl into [the] company," and persuade Apple to "take down barriers" to his access so he can explore Apple's "tone" and "culture." And the district court has authorized him to interview essentially anyone at Apple, and to copy and review any of Apple's documents and deliver them to the judge, who is presiding over ongoing damages proceedings in a related case.

Apple has objected at every stage—to the imposition of a monitorship, to the monitor the court appointed, to the breadth of his activities, and to the fees he is

1

charging Apple—but the district court overruled Apple's objections and barred Apple from further resisting the monitor's intrusive demands.  Apple is unconditionally committed to compliance with the antitrust laws, and is in full compliance with every aspect of the Final Judgment and injunction.  Exs. I, HH.*  But because the monitorship will likely be reversed on appeal and is imposing irreparable harm, Apple moved the district court for a stay while it appealed the monitorship and the underlying liability finding.  The court denied the motion.

Apple therefore asks this Court for a stay, because "but for the grant of [a stay], there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  The monitorship should never have been imposed in the first place, and the burden and intrusion the monitor is imposing on Apple cannot be remedied after the fact if the company prevails on appeal; the clock cannot be turned back.  Nor will Apple be able to recoup the substantial cost of the monitorship (at over $1,100 per hour) if it wins on appeal.  By the time Apple's appeal is decided, the monitor's two-year term will most likely be over, and the harm will be irreparably done.

Apple is likely to succeed on appeal because the monitorship exceeds the

---

 *  All Exhibit references are to the concurrently filed Boutrous Declaration.

district court's authority and violates the separation of powers. And the district court's refusal to disqualify the monitor was an abuse of discretion, because although he is supposed to be *objective* (as an officer and agent of the court itself), he filed a declaration opposing Apple's stay request on behalf of plaintiffs, which the district court credited and relied upon in denying Apple's motion. The monitor's open opposition to Apple, as well as his clear financial interest in protracting the monitorship, violate Rule 53, 28 U.S.C. § 455, and due process.

The D.C. Circuit in *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), struck down a similar monitorship on precisely these grounds: Monitors may not engage in "wide-ranging extrajudicial duties" to fill "an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." *Id*. at 1142. And this monitor, whose conduct and communications to date "would cause a reasonable person to doubt his ability to remain impartial," should be disqualified. *Id*. at 1144. A stay is therefore warranted because "the injury suffered by a party required to complete judicial proceedings overseen by" an officer whom one party seeks to disqualify "is by its nature irreparable." *Id.* at 1139.

## BACKGROUND

In late 2009, Apple approached the six major e-book publishers to explore the possibility of opening an e-bookstore along with the launch of the iPad. Ex. B at 29-30. Apple negotiated individual agreements to sell e-books as an agent for

3

five major e-book publishers in time for the iPad launch, and thereafter negotiated an agreement with the sixth major publisher. *Id.* at 76-82, 101. At the time, Amazon dominated the retail e-books market, selling "nearly 90% of all e-books." *Id.* at 14. Apple's entry into the market brought much-needed competition and innovation, resulting in a decrease in the overall price of trade e-books (the relevant antitrust market), and marked the beginning of a diverse and vibrant e-book distribution market. *Id.* at 156 & n.69.

After Apple's entry, the publishers increased the prices of certain e-books offered by Apple and other e-book retailers, and the Department of Justice and several State Attorneys General filed civil antitrust actions alleging that Apple and the five publishers conspired to raise, fix, and stabilize e-book prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Exs. A ¶ 95, SS ¶ 3. The district judge announced before trial even started that she thought Apple violated section 1. Ex. PP at 47:15-49:8. After a three-week bench trial, the district court found Apple liable, and entered judgment and a permanent injunction for plaintiffs. Exs. B, E.

Apple noticed its appeal from the district court's judgment and injunction (Ex. F), and has exceedingly strong arguments on appeal from the underlying decision. The fundamental theory underlying the court's ruling contradicts the Supreme Court's modern antitrust jurisprudence. But that question is for another day.

At issue here is the need for an immediate stay of the monitorship the district

court imposed on Apple because it had not "made any public statements admitting wrongdoing," and was "unrepentant." Ex. QQ at 64:5-8.

The monitor was ordered to review and report on Apple's antitrust compliance and training programs as they existed 90 days after his appointment, and to issue a report 90 days later. Ex. E § VI. If the monitor in his investigation uncovers evidence that Apple is violating the Final Judgment or the antitrust laws, he is required to "promptly provide that information to the United States and the … Plaintiff States." *Id.* § VI.F. The injunction requires *Apple* to pay all fees associated with carrying out the monitorship, and vests in *plaintiffs* the decision of whether the fees are "reasonable and customary." *Id.* § VI.I.

Apple did not immediately move for a stay upon entry of the injunction, because the district court assured Apple that its intention was "to rest as lightly as possible on the way Apple runs its business." Ex. D at 8-9. The court expressly did not "charge[ the monitor] with assessing Apple's compliance generally with the terms of the final judgment." *Id.* at 17. Rather, the monitor was tasked only with "doing an assessment in three months from appointment and *beginning* to engage Apple in a discussion at that point." *Id.* at 21 (emphasis added).

However, upon appointment the monitor immediately pressed for interviews with Apple's top executives, such as CEO Tim Cook, and others who have no involvement whatsoever in the day-to-day operation of the business unit at issue—

such as lead designer Jony Ive and Board member Al Gore.  Ex. L at 5; Ex. S at 1.
For those who were unable to accommodate the monitor's strict timetable, he demanded "detailed copies of their schedules."  Ex. L at 2.  The monitor was dissatisfied with the interviews Apple arranged with the high-level personnel who were actually responsible for the compliance and training measures.  Exs. M, P.  The monitor accused the company of not taking "its obligations and [the monitor's] responsibilities under the Final Judgment very seriously."  Ex. L at 2.

Interviews with the monitor require several hours of preparation (and often travel) by Apple personnel.  Ex. JJ ¶ 14; Ex. I ¶ 6.  He plans to interview the most senior executives at the company multiple times, despite their demanding schedules.  Ex. JJ ¶ 2.  And his billing rates (over $1,000 per hour) are higher than Apple has ever paid an outside lawyer (Ex. Y at 1), not to mention the additional unprecedented 15% "administrative fee" so he can make a profit (*id.* at 2; Ex. X at 2-3).

To date, *all* of the monitor's discussions—with the court, plaintiffs, and Apple—have been *ex parte*.  He has not received briefing from the parties, held a hearing, or engaged in any other traditionally judicial functions.

Apple clearly objected to the "plainly punitive" monitorship when opposing plaintiffs' proposed injunction.  Ex. C at 3 ("plaintiffs' extraordinary suggestion that the Court appoint an external monitor to oversee Apple for a ten-year period is wholly unjustified by law or fact and goes far beyond any 'logical nexus' with the

6

alleged violation"), 9, 10, 13.  It raised additional objections on November 27, 2013 based on the monitor's conduct and the court's proposed (but ultimately not entered) amendments to the injunction.  Ex. VV.  Apple continued to meet and confer with plaintiffs in an attempt to resolve its objections, but that was not successful.  Ex. JJ ¶ 12.  As a result of the mounting cost and interference with Apple's business operations, Apple sought a stay of the monitorship pending appeal.

Plaintiffs opposed Apple's motion and disputed Apple's testimony about the monitor's conduct *with a declaration from the monitor himself*.  Ex. EE.  The monitor testified, on plaintiffs' behalf, to disputed evidentiary facts based on his personal knowledge, describing discussions with Apple and its counsel.  *Ibid*.  For this and several other reasons, Apple sought the monitor's disqualification.  Ex. FF.

In a 64-page opinion relying heavily on testimony from its own agent (the monitor) the district court denied Apple any relief, fully endorsing the monitor's wide-ranging activities, and concluding that Apple was not likely to succeed on the merits and was not being irreparably harmed.  Ex. RR at 44:16-18; Ex. UU at 3.  It is not possible in this stay motion to address all the errors (of law and fact) in the court's order and opinion.  Apple has separately appealed from the district court's denial of its objections and refusal to disqualify the monitor.  Exs. ZZ, AAA.

## LEGAL STANDARD

This Court considers four factors in the exercise of its discretion to grant a

7

stay of a permanent injunction:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  "The first two factors … are the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  A party faces irreparable harm where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag*, 175 F.3d at 249; *see also Nken*, 556 U.S. at 421 ("if a court takes the time it needs, the court's decision may in some cases come too late for the party seeking review").  And while "the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest," here "[t]hese factors merge" because "the Government is the opposing party."  *Nken*, 556 U.S. at 435.

## ARGUMENT

The strong likelihood that Apple will succeed on appeal, coupled with the irreparable injury Apple is suffering from an investigative monitor, warrant a stay of the monitorship provision of the injunction during the pendency of Apple's appeal.

### I. Apple Is Likely to Succeed on Appeal

The monitorship exceeds the court's authority and violates Rule 53, the con-

stitutional separation of powers, and Apple's due process rights. Apple's strong

likelihood of success on these issues supports issuance of a stay.

### A.    The Monitor's Investigation Exceeds the Limits of Rule 53 and Violates the Constitutional Separation of Powers

Rule 53 authorizes a court to "appoint a master only to: … address …

posttrial matters that cannot be effectively and timely addressed by an available

district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). The

work of an appointed monitor may only "aid judges in the performance of specific

*judicial duties*" (*La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957))—duties

that would otherwise be addressed "by an available district judge or magistrate

judge" (Fed. R. Civ. P. 53(a)(1)(C)). This may include "the ability to convene and

to regulate hearings, to rule on the admissibility of evidence, to subpoena and

swear witnesses, and to hold non-cooperating witnesses in contempt." *Benjamin v.

Fraser*, 343 F.3d 35, 45 (2d Cir. 2003), *overruled on other grounds by Caiozzo v.

Koreman*, 581 F.3d 63 (2d Cir. 2009); *see also Reed v. Rhodes*, 691 F.2d 266, 269

(6th Cir. 1982) (special masters act "in a quasi-judicial capacity"); *Cobell*, 334

F.3d at 1139 ("Special Master-Monitor … was serving as a judicial officer"). The

district court correctly determined that the monitor was "th[e] Court's agent." Ex.

UU at 54; *see also* Ex. RR at 45:7-8 ("The monitor works for me").

To be sure, monitors may be given additional authority through a negotiated

consent decree. *See*, *e.g.*, *United States v. Microsoft*, 231 F. Supp. 2d 144 (D.D.C.

9

2002).  In those instances, the monitorships "should be construed basically as con-

tracts."  *Juan F. v. Weicker*, 37 F.3d 874, 878 (2d Cir. 1994) (citation omitted).

Indeed, parties may agree to terms that would violate the defendant's constitutional

rights.  *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 146 (2d Cir. 2011).

But absent such an agreement (as here), monitors may not engage in "'wide-

ranging extrajudicial duties'" to fill "'an investigative, quasi-inquisitorial, quasi-

prosecutorial role that is unknown to our adversarial legal system.'"  *United States*

*v. Philip Morris USA Inc.*, 566 F.3d 1095, 1149 (D.C. Cir. 2009) (per curiam)

(quoting *Cobell*, 334 F.3d at 1142).  Rather, "the district court must confine itself

(and its agents) to its accustomed judicial role."  *Cobell*, 334 F.3d at 1142.

The monitor here is not confined to a judicial role, and thus violates Rule 53.

In *Cobell*, the district court "authorized the Monitor to engage in ex parte communi-

cations, and required the [defendant] to 'facilitate and assist' the Monitor, to

'provide him with access to any offices or employees to gather information,' and to

pay his hourly fees and expenses."  *Id.* at 1141 (alterations omitted).  The Depart-

ment of Justice successfully argued on appeal that the court had no authority to

give the monitor "far-ranging investigative powers" or "require it to pay for his

services," and that the monitor should be disqualified because of his "wide-ranging

*ex parte* contacts with [Department of Interior] employees ...."  Appellants' Brief,

2003 WL 25585726 (D.C. Cir. Mar. 14, 2003); *see Cobell*, 334 F.3d at 1142 (mon-

itorship went "far beyond the practice that has grown up under Rule 53").

Apple has a strong likelihood of success on appeal for the same reasons. The monitor's stated plan is to "crawl into [the] company," and persuade Apple to "take down barriers" to his access so he can explore the company's "tone" and "culture." Ex. JJ ¶ 15; Ex. DD at 1; Ex. EE ¶ 16. His 13 interviews so far have strayed far from his mandate; for example, the monitor asked Board member and chair of the Audit and Finance Committee to identify the most significant compliance problems at the time Dr. Sugar joined Apple's Audit Committee. Ex. JJ ¶ 16. The monitor has had and continues to have *ex parte* discussions with plaintiffs and Apple. *See* Ex. W; Ex. EE ¶ 10; Ex. JJ ¶¶ 6-11. The district court fully supported the monitor's wide-ranging investigation, allowing him to interview "any" Apple employee he wishes, copy and review any document he wants, and refusing to limit the inquiry to his circumscribed role. The court held that Apple "does not control the monitorship." Ex. RR at 43, 46.

The monitor is required to turn over negative evidence he finds to Apple's adversaries, who in ongoing litigation are seeking hundreds of millions of dollars in damages and civil penalties: If he "discovers or receives evidence that suggests ... that Apple is violating or has violated this Final Judgment or the antitrust laws," the monitor is to "promptly provide that information to the United States and the … Plaintiff States." Ex. E § VI.F. This broad investigation is not "judicial."

11

The monitor also is not *objective* as required by Rule 53 and due process, because he filed a declaration *against Apple*, on behalf of plaintiffs, in opposition to Apple's motion.  Ex. EE.  He clearly collaborated with the Department of Justice and State Attorneys General in preparation of his declaration, in which he testified to the substance of his *ex parte* discussions with Apple—discussions that were themselves non-judicial, and therefore inappropriate.  Missing from his declaration were his *other ex parte* discussions with plaintiffs and the court.  Had the monitor properly been acting as a judicial officer, he would have sought permission from the court to file a report with the court on the record after hearing from both sides—as judicial ethics and due process require.  The substance of his declaration, and the need he felt to file it, are therefore indicative of the clearly inappropriate nature of his investigation.  As an "'advocate' for the plaintiffs," the monitor cannot serve as an agent of an Article III court.  *Cobell*, 334 F.3d at 1143 (quoting *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir. 1982)).

The investigation authorized violates the separation of powers, because Article III vests federal courts with only "[t]he judicial power."  U.S. Const. art. III, § 1; *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring) (judicial power is "the only kind of power that federal judges may exercise by virtue of their Article III commissions").  As a result, courts may not exercise "executive or administrative duties of a nonjudicial nature."

12

*Morrison v. Olson*, 487 U.S. 654, 677 (1988) (citation omitted).  The monitor's investigatory power here exceeds the authority the district court was authorized under Article III to delegate, and thus violates the separation of powers.

The district court determined that some of Apple's challenges were waived or abandoned (Ex. UU at 3), but that is false as both a legal and factual matter.  As plaintiffs conceded (Ex. DD at 16 n.6), a separation of powers challenge cannot be waived.  *See CFTC v. Schor*, 478 U.S. 833, 850-51 (1986).  Apple did not object to the mere *form* of the provisions in the injunction, including the monitorship, but expressly preserved all its rights to challenge the *substance* of the injunction, including the monitorship to which it had objected.  Ex. D at 29:15-16 ("I should preface all of this with we're reserving all our objections"); *see also id.* at 22:5-10 (court recognizing that parties "preserv[ed] all of the objections they've all made before and requests they've all made before").  Indeed, Apple has objected at every stage of the monitorship—it objected to the imposition of any monitor (Ex. C at 9-14); it objected to Mr. Bromwich's appointment (Ex. UU at 14); and it objected to the scope and fees of the monitorship in November (Ex. S), December (Ex. AA), and January (Ex. LL).  Many of Apple's arguments also go to how the monitorship has been applied, not only the terms as ordered, and these arguments could not have been made when the injunction was first ordered.  Ex. GG at 1-2.  Finally, the court's statement that Apple abandoned arguments it has made repeatedly to the

court by supposedly not making them in its reply brief (Ex. UU at 36-37) is base-less—Apple made these arguments in its motion *and* reply (Exs. H, GG), and in any event was not required to repeat unrebutted arguments again in its reply.

Nor is it any answer to Apple's stay request that Apple can object to the district court when the monitor oversteps his mandate. This stay request does not seek adjudication of Apple's objections; it seeks only a stay of the monitorship so Apple's challenge to the monitorship can be fully and finally adjudicated without causing Apple severe and irreparable harm. The dispute resolution process in the Final Judgment does not protect against such harm, and in any event the district court has to date rejected all of Apple's objections, which Apple is appealing.

In short, the monitor's interviewing of Apple's executives and Board members about topics far beyond Apple's antitrust compliance and training programs is an *executive*, not a *judicial* function. The monitorship thus violates Rule 53 and the separation of powers, and Apple has a strong likelihood of success on appeal.

### B.    The Monitor Must at the Very Least Be Disqualified

Even if the monitorship were appropriate and constitutional, the monitor's financial interests, his adversarial conduct, and his *ex parte* communications require disqualification under Rule 53(a)(2) and 28 U.S.C. § 455, and violate Apple's due process right to a "disinterested prosecutor."

Rule 53 requires that a monitor disqualify himself under any circumstances

in which a judge would be disqualified.  Fed. R. Civ. P. 53(a)(2).  The monitor must be disqualified if his impartiality "might reasonably be questioned," if he "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," or if he has a "financial interest" in the proceedings.  28 U.S.C. § 455(a), (b)(1), (b)(4).  "*[E]ven the appearance* of partiality" requires recusal.  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quotation marks omitted) (emphasis added); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 878 (2009) (due process).

The monitor's testimony against Apple in opposition to Apple's stay motion requires his recusal.  Ex. EE.  He testified to his "personal knowledge of disputed evidentiary facts concerning the proceeding" (28 U.S.C. § 455(b)(1)), complaining in a 75-paragraph declaration that Apple had not made its executives and Board of Directors immediately available upon his request.  Ex. EE ¶¶ 32, 42-43, 45, 54.  The declaration was not prompted by the court, but was filed *against Apple* on behalf of the Department of Justice and the State Attorneys General and clearly prepared in coordination with plaintiffs' counsel.

As a witness for plaintiffs in this case, the monitor lacks the requisite impartiality to serve as monitor.  *See*, *e.g.*, *Lister v. Commr's Court*, 566 F.2d 490, 493 (5th Cir. 1978) ("Having served as a witness for one side in the case," the monitor was "accordingly disqualified").  The monitor's declaration demonstrates "a per-

sonal bias or prejudice concerning a party, [and] personal knowledge of disputed evidentiary facts concerning the proceeding" requiring disqualification.  28 U.S.C. § 455(b)(1).

Moreover, the monitor has already determined that Apple has not taken "its obligations and [the monitor's] responsibilities under the Final Judgment very seriously" (Ex. L at 2) based clearly on "extrajudicial" information he has learned in *ex parte* discussions with plaintiffs, Apple, and the court.  *Cobell*, 334 F.3d at 1144.  *All* his communications with Apple have been *ex parte*.  And he has had numerous *ex parte* discussions with plaintiffs (*e.g.*, Ex. EE ¶¶ 9, 10), and at least one with the district judge before his appointment (*id.* ¶ 10).  Relying on these *ex parte* discussions, the monitor has rebuffed Apple's objections as a result of his "distinct advantage of having discussed [his] intentions to get off to a fast start directly with [the court] during the interviewing process."  Ex. U.

*Cobell* reversed the district court's appointment of a monitor who "had a settled opinion about what the [defendant] should and should not do … to comply with the order of the district court," which was based "in part upon *ex parte* communications received in his extrajudicial capacity."  334 F.3d at 1144.  Indeed, these *ex parte* interactions are even more problematic than in *Cobell*, because the monitor actually testified about them against the entity being monitored.

The monitor's financial interest in the monitorship is also clear grounds for

disqualification. *See* 28 U.S.C. § 455(a), (b)(4). He is unilaterally charging over $1,000 per hour plus a 15% "administrative fee," which he has explained serves the purpose of "generat[ing] profits." Exs. Y at 2, X at 2. In his first two weeks as monitor, before any documents were exchanged or interviews scheduled, he charged nearly $140,000. Ex. Y. This lucrative engagement creates a personal incentive for the monitor to prolong the term of the monitorship as long as possible. Ex. E § VI.A ("the Court may "*sua sponte* … extend the [two-year] appointment by one or more one-year periods"). It thus violates 28 U.S.C. § 455 as well as Apple's due process right to a "disinterested prosecutor" without "a personal interest, financial or otherwise." *Young*, 481 U.S. at 808 (internal quotation marks omitted).

## II.   Apple Will Suffer Irreparable Harm Absent a Stay

The monitorship is inflicting real and irreparable harm on Apple as the monitor demands access to Apple executives and Board members and racks up tremendous costs Apple will be unable to recoup if Apple ultimately prevails on appeal. A stay is warranted, because "if [this] court takes the time it needs, the court's decision may … come too late for the party seeking review." *Nken*, 556 U.S. at 421. Here, as in *Cobell*, "the injury suffered by a party required to complete judicial proceedings overseen by" an officer who one party seeks to disqualify "is by its nature irreparable." *Id.* at 1139.

17

Because the monitor's fees are not recoverable if Apple prevails on appeal, that monetary injury constitutes irreparable harm warranting a stay. *See*, *e.g.*, *Brenntag Int'l Chems.*, 175 F.3d at 249-50 (irreparable injury includes monetary obligations owed by insolvent parties); *see also Philip Morris USA, Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers) ("If expenditures cannot be re-couped, the resulting loss may be irreparable"). The rates the monitor is charging Apple are higher than any Apple has encountered in its known past matters (Ex. Y at 1), and these costs will be unrecoverable if Apple wins on appeal. Without a stay, it will lose millions of dollars before it has an opportunity to seek appellate review of the monitorship or the merits of the underlying judgment.

In addition, the monitor's demand for access to Apple's senior leadership—including officers, directors, and employees who have little or nothing to do with antitrust compliance or the iBooks Store—has already inflicted significant and ir-reparable harm by interfering with Apple's ability to manage its business. The monitor has consistently demanded that Apple's senior leaders meet with him on his schedule and on short notice—sometimes as short as two days. *E.g.*, Ex. L at 2-5; Ex CC. When some of those executives—responsible for the day-to-day man-agement of one of the largest companies in the world—have been unable to ac-commodate the monitor's strict timetable, he has demanded "detailed copies of their schedules." Ex. L at 2. He has made clear that he intends to interview the

18

executives and Board members multiple times.  Ex. JJ ¶ 2.

Plaintiffs and the district court have disputed the burden of these interviews. Ex. RR at 43:11 (court referring to "13 hours of interviews with 11 people").  But the hours spent in the actual interviews is dwarfed by the enormous burden of preparing for the interviews.  Apple representatives treat an interview with the monitor seriously.  He is an agent of the court, and he has a mandate under the Final Judgment to report to plaintiffs—many of whom are seeking hundreds of millions of dollars in damages and civil penalties—anything he views as a violation of the antitrust laws.  Ex. E § VI.F.  His communications have at times been hostile and intrusive.  *See*, *e.g.*, Ex. T; Ex. W.  As a result, Apple personnel have spent hours preparing for and attending his interviews.  *See* Ex. JJ ¶ 14.

In addition, Apple has been able to limit the interviews and document production only by resisting the monitor's requests, but the district court's recent order essentially removes Apple's ability to do so.  The court made clear that "Apple does not control the monitorship" (Ex. RR 43:4-5), and stated that "Apple's reaction to the existence of a monitorship underscores the wisdom of its imposition" (Ex. UU at 63).  Emboldened by the district court's overruling Apple's objections in their entirety, the monitor will no doubt push for an even broader investigation.

The monitor's intrusion on the high-level operation of the company warrants a stay.  *Cobell*, 334 F.3d at 1139-40.  Barriers to "unfettered" management of a

19

property or business "result[] in delays, missed opportunities, and, most important-ly, unquantifiable damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009). These "los[t] business opportunities," like loss of goodwill and harm to a business's reputation, cannot be translated "with any precision [into an] amount of monetary loss" and therefore irreparably harm a company. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

## III.    A Stay of the Injunction Will Not Harm Plaintiffs or the Public Interest

The monitorship that Apple seeks to stay is only one aspect of the permanent injunction, and Apple has fully complied with every other provision, which is more than sufficient to protect the public interest during a stay of the monitorship. Apple has already renegotiated its agreements with the publisher defendants pursuant to the Final Judgment (Ex. E §§ III, IV), and hired an outside law firm to assist Apple in enhancing its compliance programs (Ex. I ¶ 3). Apple distributed the Final Judgment to all relevant personnel, confirmed that they have read and under-stood its terms, and held three live trainings for employees. *Id.* ¶ 4. These safe-guards are more than sufficient to protect the public interest.

## CONCLUSION

This Court should stay section VI of the injunction and all related proceed-ings pending Apple's appeal.

Dated:  January 17, 2014

/s/ Theodore J. Boutrous, Jr.
  Theodore J. Boutrous, Jr.
  Daniel G. Swanson
  Gibson, Dunn & Crutcher LLP
  333 South Grand Avenue
  Los Angeles, California  90071
  (213) 229-7804
  tboutrous@gibsondunn.com

  Cynthia E. Richman
  Gibson, Dunn & Crutcher LLP
  1050 Connecticut Avenue, NW
  Washington, D.C.  20036
  (202) 955-8500

  *On behalf of Defendant Apple Inc.*