# 13-3741(L)

13-3748, 13-3783, 13-3857, 13-3864, 13-3867 (CON)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA, STATE OF TEXAS, STATE OF CONNECTICUT, STATE OF ALABAMA, STATE OF ALASKA, STATE OF ARIZONA, STATE OF ARKANSAS, STATE OF COLORADO, STATE OF DELAWARE, STATE OF IDAHO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MISSOURI, STATE OF NEBRASKA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH DAKOTA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF UTAH, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WEST VIRGINIA, STATE OF WISCONSIN, COMMONWEALTH OF PUERTO RICO, and DISTRICT OF COLUMBIA,

*Plaintiffs-Appellees*,

(Additional caption on inside cover)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (JUDGE DENISE COTE)

**[PAGE PROOF] JOINT BRIEF FOR PLAINTIFFS-APPELLEES UNITED STATES AND PLAINTIFF-STATES**

WILLIAM J. BAER
*Assistant Attorney General*

MARK W. RYAN
LAWRENCE E. BUTERMAN
DANIEL MCCUAIG
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division

KRISTEN C. LIMARZI
ROBERT B. NICHOLSON
DAVID SEIDMAN
FINNUALA K. TESSIER
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division
  950 Pennsylvania Ave. NW Room 3224
  Washington, DC 20530-0001
  202-305-7420

(Additional counsel listed on inside cover)

v.

APPLE, INC., SIMON & SCHUSTER, INC., VERLAGSGRUPPE GEORG VON
HOLTZBRINCK GMBH, HOLTZBRINCK PUBLISHERS, LLC, d/b/a MACMILLAN,
SIMON & SCHUSTER DIGITAL SALES, INC.,

*Defendants-Appellants*,

and

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
THE PENGUIN GROUP, A DIVISION OF PEARSON PLC,
PENGUIN GROUP (USA), INC.,

*Defendants*.

---

GREG ABBOTT
  *Attorney General of Texas*

DANIEL T. HODGE
  *First Assistant Attorney General*

JOHN SCOTT
  *Deputy Attorney General for Civil*
  *Litigation*

JONATHAN F. MITCHELL
  *Solicitor General*

ANDREW OLDHAM
  *Deputy Solicitor General*

ERIC LIPMAN
  *Assistant Attorney General*
  Office of Attorney General of Texas
  P.O. Box 12548
  Austin, TX 78711-2548
  512-436-1579

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*

WON S. SHIN
  *Assistant Solicitor General*
  Office of Attorney General of New
    York
  120 Broadway, 25th Floor
  New York, NY 10271
  212-416-8808

GEORGE JEPSEN
  *Attorney General of Connecticut*

W. JOSEPH NIELSEN
  *Assistant Attorney General*
  Office of Attorney General of
    Connecticut
  55 Elm Street
  Hartford, CT 06106
  860-808-5040

Counsel for Plaintiffs State of Texas and State of Connecticut also represent the
following Plaintiffs: State of Alabama, State of Alaska, State of Arizona, State of
Arkansas, State of Colorado, State of Delaware, State of Idaho, State of Illinois, State
of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Maryland,
Commonwealth of Massachusetts, State of Michigan, State of Missouri, State of
Nebraska, State of New Mexico, State of New York, State of North Dakota, State of
Ohio, Commonwealth of Pennsylvania, State of South Dakota, State of Tennessee,
State of Utah, State of Vermont, Commonwealth of Virginia, State of West Virginia,
State of Wisconsin, Commonwealth of Puerto Rico, and District of Columbia.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................iii

JURISDICTIONAL STATEMENT............................................................ 1

ISSUES PRESENTED............................................................................ 2

STATEMENT OF THE CASE ................................................................. 4

   A.  Formation And Implementation Of The Conspiracy To Fix
       Ebook Prices ................................................................................ 6

      1.  Publishers Fear And Loathe $9.99 Ebook Pricing .................. 6

      2.  Apple Wants To Sell Ebooks, But Does Not Want To
          Compete With Amazon's Prices.............................................. 10

      3.  Apple Lobbies For An Industry-Wide Move To Agency
          As The Way To Raise Ebook Prices....................................... 12

      4.  Apple And The Publisher-Defendants Agree On Higher
          Prices..................................................................................... 18

      5.  Apple And The Publisher-Defendants Reassure One
          Another That They Are Acting Together .............................. 22

      6.  After Signing The Apple Agency Agreements, The
          Publisher-Defendants Move All Retailers To Agency........... 26

      7.  Ebook Prices Rise To The Price Caps .................................... 30

   B.  The Publisher-Defendants Settle And Apple Is Found
       Liable After Trial ....................................................................... 33

SUMMARY OF ARGUMENT................................................................. 38

STANDARD OF REVIEW ..................................................................... 42

ARGUMENT ........................................................ 43

I.  Apple And Five Book Publishers Conspired To Fix Ebook
    Prices – A *Per Se* Violation Of The Sherman Act ....................... 43

    A.  The Horizontal Conspiracy To Fix Ebook Retail Prices
        Is *Per Se* Unlawful............................................... 44

        1.  Apple's Participation Does Not Exempt This Horizontal
            Price-Fixing Conspiracy From *Per Se* Treatment ........... 46

        2.  There Are No Justifications For Horizontal Price Fixing. 50

    B.  The Evidence Proved That Apple Participated In A
        Horizontal Price-Fixing Conspiracy ....................................... 54

        1.  Plaintiffs Did Not Have A Heightened Burden Of Proof .. 57

        2.  Participation By Apple – A Vertically Related Entity –
            Does Not Make The Horizontal Conspiracy Implausible. 65

        3.  The Court Did Not Infer Conspiracy From The Contract
            Terms Alone, But From The Evidence Of Collusion ........ 67

        4.  Apple Unsuccessfully Attacks A Few Bits Of The
            Totality Of The Evidence, While Ignoring The Rest ........ 74

II.  Apple's Conduct Is Also Illegal Under The Rule Of Reason ....... 82

III.  The District Court Properly Excluded Unsupported And
     Undisclosed Opinions From An Apple Expert............................ 92

IV.  The Injunction Is Designed To End Apple's Anticompetitive
     Conduct, Prevent Its Recurrence, And Restore Competition...... 97

CONCLUSION.................................................................. 104

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abrahamson v. Board of Education*,
    374 F.3d 66 (2d Cir. 2004) ................................................................ 43

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) ............... 48

*Amorgianos v. National Railroad Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .............................................................. 93

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982).......................................................................... 50

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
    650 F.3d 876 (2d Cir. 2011) .............................................................. 42

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979) ............... 51, 53, 89

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).......................................................................... 89

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988).................................................................... 44, 46

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical
    Associates, Inc.*, 996 F.2d 537 (2d Cir. 1993) .............................. 83, 86

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)...................... 45

*Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003)................................. 103

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370
    U.S. 690 (1962) .......................................................................... 70, 77

iii

*Denny's Marina, Inc. v. Renfro Productions, Inc.*,
  8 F.3d 1217 (7th Cir. 1993) .......................................................... 46, 47

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) .................................... 75

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ..................... 63

*Ex Parte Peterson*, 253 U.S. 300 (1920) ............................................... 102

*Fineman v. Armstrong World Industries, Inc.*,
  980 F.2d 171 (3d Cir. 1992) ........................................................... 63

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ......................... 102

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ........................................................................ 54

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ....................... 93, 94

*Geneva Pharmaceuticals Technology Corp. v. Barr
  Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004) ............................. 87

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust
  System, Inc.*, 723 F.3d 1019 (9th Cir. 2013) ................................... 51

*In re High Fructose Corn Syrup Antitrust Litigation*,
  295 F.3d 651 (7th Cir. 2002) .......................................................... 74

*In re Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010) ........................................... 46, 47, 65, 90

*In re Publication Paper Antitrust Litigation*,
  690 F.3d 51(2d Cir. 2012), ............................................................. 58

*In re Sulfuric Acid Antitrust Litigation*,
  703 F.3d 1004 (7th Cir. 2012) ........................................................ 51

*In re Unisys Savings Plan Litigation,*
  173 F.3d 145 (3d Cir. 1999) ............................................................. 96

*Interstate Circuit v. United States,*
  306 U.S. 208 (1939) ....................................................................... 61

*K.M.B. Warehouse Distributors, Inc. v. Walker*
  *Manufacturing Co.,* 61 F.3d 123 (2d Cir. 1995) ................................ 86

*Krieger v. Gold Bond Building Products,*
  863 F.2d 1091 (2d Cir. 1988) .......................................................... 42

*L.A.P.D., Inc. v. General Electric Corp.,*
  132 F.3d 402 (7th Cir. 1997) ........................................................... 89

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007) ................................................................. 48, 49

*Local 28 of Sheet Metal Workers' International Ass'n v.*
  *EEOC,* 478 U.S. 421 (1986) ........................................................... 102

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
  542 F.3d 290 (2d Cir. 2008) ............................................................ 93

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ................................................................. 58, 72

*Monsanto Co. v. Spray-Rite Service Corp.,*
  465 U.S. 752 (1984) ................................................... 57, 58, 73, 75

*National Society of Professional Engineers v. United States,*
  435 U.S. 679 (1978) ................................................... 45, 82, 90, 97

*NCAA v. Board of Regents of the University of Oklahoma,*
  468 U.S. 85 (1984) ......................................................................... 52

*Northern Pacific Railway Co. v. United States,*
  356 U.S. 1 (1958) ........................................................................... 45

v

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998) ................................. 95

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ................. 98

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988) ...................... 96

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) ................................... 94

*Spectators' Communication Network Inc. v. Colonial
    Country Club*, 253 F.3d 215 (5th Cir. 2001) .................................... 63

*Toledo Mack Sales & Serivice, Inc v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ........................................... 49, 51

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ................. *passim*

*United States v. All Star Industries*,
    962 F.2d 465 (5th Cir. 1992) ........................................... 47

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ................... 56, 78

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ............................. 77

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ........................ 94

*United States v. E.I. Du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ........................................................ 98

*United States v. General Motors Corp.*, 384 U.S. 127 (1966) ............... 72

*United States v. Kalymon*, 541 F.3d 624 (6th Cir. 2008) ...................... 97

*United States v. MMR Corp. (LA)*,
    907 F.2d 489 (5th Cir. 1990) ........................................... 47

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ............................................... 45, 50, 54

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ........................ 93

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...................................................... 45

*Viacom International v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ........................................................ 98, 100

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ........................................................................ 104

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ........................................................................ 97

*Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC*, 571 F.3d 206 (2d Cir. 2009) .......................... 42

*Zhang v. Gonzales*, 426 F.3d 540 (2d Cir. 2005) .................................... 103

# FEDERAL STATUTES AND RULES

15 U.S.C.:
  § 1................................................................ 2, 5, 44, 47
  § 4............................................................................... 1
  § 15c........................................................................... 1
  § 26............................................................................. 1

28 U.S.C.:
  § 1291......................................................................... 1
  § 1292(a)(1) ............................................................... 1
  § 1331......................................................................... 1
  § 1337(a)..................................................................... 1
  § 1345......................................................................... 1

Federal Rules of Civil Procedure:
  52(a)(6)....................................................................42
  53......................................................................37, 103

# MISCELLANEOUS

Phillip Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* (4th ed. 2011).............................................................58

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the United States' claims in *United States v. Apple Inc., et al.*, No. 12-cv-2826 (S.D.N.Y.), under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345. A Final Judgment was entered on September 5, 2013, and the appellants timely appealed on October 3 and 4, 2013. This Court has jurisdiction over those appeals (Nos. 13-3741, 3748, 3783) under 28 U.S.C. § 1291.

The district court had subject matter jurisdiction over the Plaintiff-States' claims in *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394 (S.D.N.Y.), under Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c, 26, and under 28 U.S.C. §§ 1331, 1337(a). An Order Entering Permanent Injunction was entered on September 5, 2013, and the appellants timely appealed on October 3 and 4, 2013. This Court has jurisdiction over those appeals (Nos. 13-3857, 3864, 3867) under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.  Whether the district court erred in finding that a conspiracy among Apple and the Publisher-Defendants to fix and raise retail prices for electronic books was *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.  Whether the district court clearly erred in finding that Apple participated in such a conspiracy.

3.  Whether the district court erred in finding, in the alternative, that the conspiracy among Apple and the Publisher-Defendants was illegal under the rule of reason because it had anticompetitive effects and no procompetitive benefits.

4.  Whether the district court abused its discretion in excluding certain opinions of Apple's expert witness as unsupported by reliable methodology, beyond the scope of the expert's direct testimony, or not timely disclosed.

5.  Whether the district court abused its discretion in entering an injunction that prohibits Apple from discriminating against ebook applications and entering contracts that restrict its ability to discount

ebook prices, and that imposes an external compliance monitor to evaluate Apple's antitrust training and compliance programs.

6.  Whether, by enjoining Apple from entering contracts that restrict discounting, the district court amended two publishers' consent decrees.

## STATEMENT OF THE CASE

In late 2009 and early 2010, Apple orchestrated and participated in a conspiracy with five major book publishers[1] to take control of retail pricing for electronic books (ebooks) and to raise prices to agreed-upon levels.  The conspiracy was successful: retail ebook prices for the vast majority of the Publisher-Defendants' new releases and bestsellers rose from $9.99 to $12.99 or $14.99.  Consumers paid almost 20% more, on average, for all of the Publisher-Defendants' ebooks.

On April 11, 2012, Plaintiffs, the United States of America and sixteen states and U.S. territories,[2] filed two separate complaints alleging that Apple and the Publisher-Defendants had violated

---

[1] The Publisher-Defendants are Hachette Book Group, Inc., HarperCollins Publishers LLC, Holtzbrinck Publishers LLC d/b/a Macmillan, Penguin Group (USA), Inc., and Simon & Schuster, Inc.

[2] Additional states joined the case with the filing of the Second Amended Complaint.  The now thirty-three Plaintiff-States are Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Mexico, New York, North Dakota, Ohio, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, the District of Columbia, and Puerto Rico.

Section 1 of the Sherman Act, 15 U.S.C. § 1.[3]  The Publisher-Defendants

settled, entering into consent decrees that, *inter alia*, limited their

ability to control ebook retail pricing.  Apple alone proceeded to trial.

After extensive evidentiary submissions, detailed pre-trial briefing,

and a three-week bench trial, the district court, Honorable Denise Cote,

issued an Opinion and Order with 100 pages of fact findings.  Dkt.326;[4]

*United States v. Apple Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013).  The

court found that Apple had conspired with the Publisher-Defendants to

raise ebook retail prices and that this conspiracy was a *per se* unlawful

horizontal price-fixing conspiracy in violation of Section 1.  The court

ruled in the alternative that the conspiracy was unlawful under Section

1's rule of reason because its anticompetitive effects were without any

countervailing procompetitive benefits.

On September 6, 2013, after additional briefing and oral argument,

the district court entered a final judgment and permanent injunction

---

[3] Plaintiff-States also alleged and successfully proved violations of
congruent state statutes.  In its appeal, Apple raises no issues specific
to these state-law claims.

[4] All docket references are to the docket in the United States' case,
No. 12-cv-2826.

against Apple.  Dkt.374; *United States v. Apple, Inc.*, 2013 WL 4774755
(S.D.N.Y. Sept. 5, 2013).  Among other restrictions, the Injunction
prohibits Apple from contracting with the Publisher-Defendants to
restrict Apple's ability to discount ebooks.  The Injunction also provides
for an external compliance monitor to evaluate Apple's antitrust
training and compliance programs.

On October 3, 2013, Apple appealed the judgment, contesting both
liability and remedy.  *See* Appellant Apple's Opening Brief (Br.).  Two
Publisher-Defendants, Simon & Schuster and Macmillan, appealed on
remedy.[5]  *See* Opening Briefs for Appellants Macmillan (Macmillan Br.)
and Simon & Schuster (S&S Br.).

## A.  Formation And Implementation Of The Conspiracy To Fix Ebook Prices

### 1.  Publishers Fear And Loathe $9.99 Ebook Pricing

Until April 2010, publishers distributed ebooks on the same
wholesale model used to distribute print books.  Publishers set a list
price for each ebook and charged retailers a per-copy wholesale price

---

[5] Bob Kohn filed an amicus brief supporting Macmillan and Simon &
Schuster (Kohn Br.).  Washington Legal Foundation and two
economists, Bradford Cornell and Janusz Ordover, filed amicus briefs
supporting Apple (WLF Br. and Economist Br.).

that was generally around half of the list price.  Dkt.326.14,53;
PX-835¶¶22,25 (JA___, ___, ___, ___).  Retailers were then free to
compete with each other on retail price.  Amazon (the market leader in
ebook retail sales) priced many bestselling and new release ebooks at
$9.99, Dkt.326.14; PX-835¶25 (JA___, ___).  That price was often
matched, or at least approached, by Barnes & Noble and other ebook
retailers.  PX-180-6 (JA___).

Publishers feared that the $9.99 price would, *inter alia*,[6] erode prices
for print books, which were still their main business.  Dkt.326.15;
Tr. 335:7-336:20, 969:15-23, 1258:5-10, 2033:10-18; PX-78-9, 129
(JA___, ___-___, ___, ___, ___, ___, ___).  Hachette Chairman David
Young explained that publishers wanted to defeat Amazon's pricing
policy to prevent the "wretched $9.99 price point becoming a de facto
standard."  Dkt.326.16; PX-274; Tr. 1398:7-1400:15 (JA___, ___,
___-___).

---

[6] For example, the Publisher-Defendants also worried that Amazon
would "disintermediate" publishers, seeking to negotiate directly with
authors and literary agents for publishing rights.  Dkt.326.16,
PX-133-2, 438-2, 505-2 (JA___, ___, ___, ___).

The publishers' fears played out against a backdrop of a close-knit publishing industry in which competitors frequently communicated, notably at regular CEO dinners in the private rooms of upscale Manhattan restaurants (without counsel present).  Dkt.326.19; Tr. 456:19-460:9 (JA___, ___-___).  Before one such dinner, Hachette's Young promised his boss, Arnaud Nourry, that he would discuss with his competitors options for confronting Amazon "in order to control their strategy and pricing."  Dkt.326.19; PX-219 (JA___, ___).  The publishers knew that they needed "a critical mass" to convince Amazon to change its pricing practices, Dkt.326.20; PX-344 (JA___, ___), and therefore sought a "common strategy," Dkt.326.18; PX-133-2 (JA___, ___).  For example, in the summer of 2009, the publishers discussed a joint venture to sell ebooks, the goal of which was "less to compete with Amazon than to force it to accept a price level higher than 9.99." Dkt.326.18-19; PX-391, 392 (JA___-___, ___, ___).

In late 2009, some publishers tried to pressure Amazon to abandon the $9.99 price point by "windowing" – withholding for a limited time ebook versions of some new releases.  Dkt.326.20-21; Tr. 465:25-466:9; 2036:1-9; PX-349, 393, 394 (JA___-___, ___- ___, ___, ___, ___, ___, ___).

8

Because the publishers recognized that windowing had little hope of success without coordination, Dkt.326.21-22; PX-393, 394, 427 (JA___-___, ___, ___, ___), they attempted to coordinate their efforts by encouraging each other to join "the Club," Dkt.326.22; PX-416 (JA___, ___); *see also* PX-96, 274, 347, 437, 446 (JA___, ___, ___, ___-___, ___).

The publishers' efforts to raise Amazon's $9.99 price were widely reported in the press. *The Wall Street Journal* and *The New York Times* reported that Simon & Schuster, Hachette, HarperCollins, and Macmillan had announced their intention to window ebooks in the upcoming year.  Dkt.326.22-24; PX-617; DX-67 (JA___-___, ___-___, ___-___).  Simon & Schuster was taking "a dramatic stand against the cut-rate $9.99 pricing of e-book best sellers."  PX-617-1 (JA___). Hachette's Young said his company was planning to follow suit in an effort to "preserve our industry" from authors' work being "sold off at bargain-basement prices."  PX-617-2 (JA___)*.* Those early efforts, however, were largely unsuccessful.  Only a few publishers windowed a few titles, Tr. 2066:11-14 (JA___), and Amazon did not feel sufficiently pressured to raise its $9.99 price, PX-835¶35 (JA___), until Apple arrived and showed the publishers the means to achieve their goal.

9

### 2. Apple Wants To Sell Ebooks, But Does Not Want To Compete With Amazon's Prices

In connection with the upcoming launch of the iPad, Apple was considering selling ebooks. Apple Senior Vice President Eddy Cue and his team researched entry into the ebooks market, which they predicted would have sales of nearly $1 billion in 2010. Dkt.326.27; PX-735 at 5 (JA___, ___). In November 2009, Apple CEO Steve Jobs authorized Cue to pursue the development of an Apple ebook store, later called the iBookstore. Dkt.326.28; Tr. 1810:5-18 (JA___, ___). Cue subsequently acknowledged, however, that "Apple certainly would have launched the iPad without an e-bookstore." DX-714¶49; Dkt.326.156 (JA___, ___).

Apple knew from press reports about the publishers' stand against Amazon's $9.99 pricing. PX-691 (JA___-___). Shortly after those reports, Cue, together with Keith Moerer (a Director of iTunes) and Kevin Saul (Apple Associate General Counsel), flew to New York for a series of meetings with each of the six largest publishers of trade books in the United States. Dkt.326.32; PX-262 (JA___, ___-___). From the outset, Cue made clear to each publisher CEO that Apple was meeting with counterparts at the other publishers. PX-73, 112, 299, 301, 314 (JA___, ___, ___, ___, ___).

10

Cue already knew that the publishers hated Amazon's pricing and "would do almost anything for [Apple] to get into the ebook business." Dkt.326.28; PX-27 (JA___, ___).  His December 15th and 16th meetings with the publisher CEOs confirmed that understanding.  Dkt.326.34-35; PX-50, 693; Tr. 176:14-178:11; 1903:25-1904:4 (JA___-___, ___-___, ___-___, ___-___, ___-___).  Simon & Schuster's executives admitted to Cue that they "hate[d] Amazon pricing," PX-36-3; Tr. 183:7-14 (JA___, ___), while Macmillan's representatives indicated that they would prefer a retail price of $14.99, PX-36-2; Tr. 180:8-22 (JA___, ___).

As Hachette's Nourry recognized, the publishers' and Apple's "business interests [were] very much aligned."  Dkt.326.36; PX-298 (JA___, ___).  Apple did not want to compete with Amazon on price, Tr. 1718:25-1719:3, 1833:24-1834:2 (JA___-___, ___-___), and the publishers wanted to end Amazon's low pricing.  Apple assured the publishers that it was "not interested in a low price point" for ebooks and had no desire for "Amazon's $9.95 [sic] to continue."  Dkt.326.36; PX-510 (JA___, ___); *see also* PX-148, 338, 353 (JA___-___, ___, ___-___).  Apple suggested that ebooks be priced instead at $12.99 and $14.99.  PX-359 (JA___-___).  The publishers, who discussed the meetings with one

11

another, were pleased.  Tr. 478:23-480:8; PX-299, 338, 861 (JA___-___,

___, ___, ___).  Hachette's Young told Simon & Schuster CEO Carolyn

Reidy that he was much "happier" after his meeting with Cue, who

"talk[ed] a different language . . . Not $9.95 [sic]."  PX-162; Tr. 479:25-

480:8 (JA___, ___-___); *see also* Dkt.326.36-37 (JA___-___).

### 3.  Apple Lobbies For An Industry-Wide Move To Agency As The Way To Raise Ebook Prices

Apple initially intended to sell ebooks under the wholesale model

used by other ebook retailers, as it already had experience using a

wholesale model in its iTunes music store.  DX-714¶36 (JA___).  At the

initial meetings, Hachette and HarperCollins proposed switching to an

agency model, in which publishers – not retailers – set ebook prices, as

the way to "to fix Amazon pricing," Dkt.326.35; PX-36-3 (JA___, ___),

that is to "fix the 9.99 price," Tr. 1697:12-19 (JA___).  Apple quickly

realized that agency could help it and the publishers eliminate retail

price competition and raise ebook prices.  As Apple's Kevin Saul

explained at trial, if the publishers all moved to an agency model, Apple

would not have to compete with Amazon's low prices because "the

publishers would set the prices and [Apple] knew that they were

interested in setting higher prices."  Tr. 189:19-24 (JA___).

12

On December 18, two days after the initial meetings, Cue set about organizing an industry-wide switch to agency as a way to raise ebook prices. Knowing that Hachette and HarperCollins already supported agency, Cue pitched the agency model to the CEOs of Random House, Macmillan, and Simon & Schuster. Dkt.326.40-41; Tr. 1702:1-1704:11, 1710:10-1711:21 (JA___-___, ___-___, ___-___). Cue chose these three carefully. Dkt.326.41 (JA___). Random House was the largest publisher. Tr. 2042:12-13 (JA___). Macmillan CEO John Sargent "was a book guy" who would "appreciate" what Apple was doing. Tr. 2043:17-2044:1 (JA___-___). Simon & Schuster CEO Carolyn Reidy was a real "leader" – her company was already windowing. Tr. 2042:14-17; 2043:6-9 (JA___, ___). Penguin, in contrast, was a "follower" that wasn't "going to be the early one[] to sign," Tr. 2042:4-11, 2043:6-9 (JA___, ___).

Cue told the publishers what they wanted to hear – that "book prices are becoming too low," Dkt.326.42; PX-336; Tr. 1705:8-14 (JA___, ___, ___), and presented agency as an industry-wide solution to an industry-wide problem. According to Cue, "all publishers" and "all retailers" needed to move to agency. Tr. 1712:25-1714:3 (JA___-___).

13

He told Reidy that he "didn't think anything [other than agency] would keep the market from its current pricing 'craziness.'" Dkt.326.42; PX-540; Tr. 500:8-11 (JA___, ___, ___). As Cue reported to Jobs, the publisher CEOs understood that "the plus" of his agency plan was that it "solves [the] Amazon issue." Dkt.326.43; PX-43 (JA___, ___).

At trial, Cue claimed to have meant only that Apple would sell new release ebooks above $9.99 – not that all other retailers would do so. The court found, however, that this testimony was not credible. Dkt.326.43n19 (JA___). As Kevin Saul acknowledged, the agency plan would not solve the publishers' pricing problem if Amazon remained on wholesale, pricing at $9.99. Tr. 251:4-19 (JA___). Rather, it would solve the publishers' Amazon complaints only if the publishers were "successful in getting everyone on an agency model." Tr. 203:3-9 (JA___). Apple likewise viewed it as essential that Amazon be moved to agency, since Apple could not compete effectively if the iBookstore sold ebooks at prices significantly higher than those charged by Amazon. Dkt.326.39-40, 326.43n19; PX-55 (JA___-___, ___, ___)

To implement the "all agency" plan, Cue on January 4 and 5, 2010, emailed the CEOs of each of the "Big Six" publishers a substantively

14

identical term sheet.  Dkt.326.45; PX-21, 40, 41, 76, 306, 473, 476
(JA___, ___, ___, ___, ___, ___, ___, ___-___).  The introduction to the
email differed depending on whether the publisher was among those to
whom Cue had pitched agency in late December ("As we discussed" or
"After talking to all the other publishers . . . .").  *Id.*  The terms allowed
the publishers to set ebook retail prices in accordance with a pricing
schedule that linked the prices of ebooks to those of their hardcover
versions and gave Apple a 30% agency commission on sales through the
iBookstore.  The proposed terms also explicitly provided that "all
resellers of new titles need to be in agency model."  Dkt.326.46 (JA___);
*see, e.g.*, PX-21 (JA___).  Apple later doubted, however, that it could
"legally force" the express "all resellers . . . in agency" requirement.
Dkt.326.49; PX-487 (JA___, ___).  Apple and the publishers needed
another mechanism to move the industry to agency.

Shortly thereafter, Kevin Saul devised an "elegant" solution,
Dkt.326.48; Tr. 248:9-14 (JA___, ___) – a "Most Favored Nation" clause
(MFN) that required the publisher-set prices for new releases sold in
the iBookstore to match the lowest price offered by any other retailer,
even if that retailer was on a wholesale model, Dkt.326.47 (JA___); *see,*

15

*e.g.*, PX-248-5 (JA___).  The draft contract that Apple circulated on

January 11, 2010, replaced the prior term sheet's "all resellers . . .  in

agency" requirement with the MFN.  *See* PX-248, 249, 285, 286, 322,

(JA___-___, ___-___, ___-___, ___-___, ___-___); *see also* Tr. 1722:8-12,

1725:2-1729:9 (JA___, ___-___).

For the publishers, accepting Apple's proposed MFN would make

sense only if Amazon could be moved to an agency model as well.  If the

publishers moved all their ebook retailers to agency, they could raise

ebook retail prices above $9.99.  Under Apple's proposed agency

agreement, publishers would receive 70% of a title's retail price on the

iBookstore.  For example, for ebooks priced at $12.99, the publishers

would receive about $9.  Dkt.326.53-55; Tr. 438:4-5 (JA___, ___).  While

this was less than prior wholesale prices, the Publisher-Defendants

were willing to accept less to rid the market of the $9.99 price.

By contrast, if Amazon (or any other retailer) remained on wholesale

and priced at $9.99, the MFN would force the publishers to match that

price in the iBookstore, so that the publishers would receive only $7 a

book from Apple.  *Id.*  Accepting lower revenues while cementing the

$9.99 price by adding another retailer selling at that price would have

given the publishers the worst of both worlds.  Dkt.326.54-55;

Tr. 251:4-252:24, 363:16-364:1, 436:18-438:5, 504:10-14, 2037:2-2040:25

(JA___-___, ___-___, ___-___, ___-___, ___, ___-___).  As Cue explained to

a colleague, the MFN "forc[es] people off the [A]mazon model and onto

ours."  PX-65; Tr. 1994:18-1996:4, 1997:3-7 (JA___, ___-___, ___).

Apple made sure the publishers understood this consequence of the

MFN.  On January 20, Macmillan's Sargent told Amazon's Vice

President for Kindle, Russell Grandinetti, that Macmillan intended to

offer both agency and wholesale models,  Dkt.326.70-71; PX-482,

835¶40 (JA___-___, ___, ___), but at a dinner that evening, Cue

informed Sargent that Macmillan had no choice but to move Amazon to

an agency model if it wanted to sign an agency agreement with Apple,[7]

Dkt.326.71; PX-37 (JA___, ___).  The following day, Sargent told

---

[7] At trial, Cue denied discussing the MFN with Sargent during their
dinner, Tr. 1746:5-18, 2023:1-7 (JA___, ___), but the district court found
that denial not credible in the face of Cue's deposition testimony and his
contemporaneous report to Jobs that Sargent had "legal concerns over
the price-matching," Dkt.326.71n38; Tr. 1749:2-25; PX-42 (JA___, ___,
___).  Similarly, Sargent's claim not to remember the conversation, Tr.
1122:8-12 (JA___), was belied by his contemporaneous email to Cue
referring to "the single large issue" that could derail negotiation, PX-37;
Dkt.326.71n38 (JA___, ___).

Grandinetti that the Apple contract required him to offer only the agency model. Dkt.326.72; PX-835¶41 (JA___, ___).  Indeed, the Publisher-Defendants all understood that signing on with Apple meant moving all their retailers to agency.  Dkt.326.73 (JA___); *see e.g.*, Tr. 1987:8-1988:12; PX-341, 351, 482, 503, 530 (JA___-___, ___-___, ___-___, ___-___, ___, ___).

### 4.  Apple And The Publisher-Defendants Agree On Higher Prices

Apple's initial term sheets and draft contracts also proposed a schedule of price tiers for ebooks with price caps linked to hardcover book prices.  *See, e.g.*, PX-21, 286-14. (JA___, ___).  According to the draft contract circulated on January 11, *see, e.g.*, PX-286-14 (JA___), new releases listed for $30 or less (hardcover) would sell for a maximum of $12.99.  Those listed between $30.01 and $35 (hardcover) would sell for a maximum of $14.99.  Price caps then increased by $5 for every $5 increase in the hardcover list price.

Both Apple and the Publisher-Defendants understood that these "price caps" would be the actual and uniform retail prices for ebooks. Dkt.326.59; Tr. 1452:15-1453:8, 1691:4-13; PX-23, 32, 156, 569, 612 (JA___, ___-___, ___, ___-___, ___, ___, ___, ___-___).  As Hachette's

Nourry testified, the purpose of moving to the agency model and adopting price caps was to ensure that "people all have the same prices."  Dkt.326.64; PX-884.164 (JA___, ___).  In the words of a HarperCollins executive, "Apple would control price and that price would be standard across the industry."  Dkt.326.64; PX-308 (JA___, ___); *see also* PX-307-2 (JA___).

On January 11, 2010, Apple's Moerer emailed the publishers nearly identical tables to demonstrate how Apple's proposed pricing schedule would result in new higher uniform prices.  Dkt.326.59-60; PX-522, 523, 524 (JA___-___, ___-___, ___-___, ___-___).  The tables, a sample of which is reproduced in the court's opinion, Dkt.326.61 (JA___), and below, showed fiction New York Times Bestsellers from each of the six publishers, with a hardcover list price, Amazon hardcover and ebook prices, Barnes & Noble ebook price, and proposed Apple ebook price (this last item was shown only for the specific addressee's titles).  For all publishers, the Apple price was $12.99 or $14.99 (the maximum under the appropriate price tiers) and always higher than the then-current Amazon or Barnes & Noble ebook price.

Subject: our meeting tomorrow
Date: Mon, 11 Jan 2010 14:34:29 -0800
From: Keith Moerer <kmoerer@apple.com>
To: <david.shanks@us.penguingroup.com>
Cc: Eddy Cue <cue@apple.com>
Message-ID: <75004564-BE31-48CE-A0EC-EC9ECC98D588@apple.com>

---

David--

I look forward to meeting with you and Genevieve tomorrow morning.

Kevin Saul has sent a draft agreement in separate email. Eddy has also asked me to send you our
pricing analysis of Jan. 1 NYT bestsellers, which will help explain the price tiers we've proposed
for hardcover new releases.

Best, Keith

| NYT Bestsellers-Hardcover Fiction Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|
| The Lost Symbol | Dan Brown | Random House | $29.95 | $12.00 | $9.60 | $9.60 | |
| I, Alex Cross | James Patterson | Hachette | $27.99 | $16.79 | $9.99 | $9.99 | |
| Under the Dome | Stephen King | Simon & Schuster | $35.00 | $21.00 | $9.99 | $9.99 | |
| The Help | Kathryn Stockett | Penguin | $24.95 | $9.50 | $8.55 | $8.55 | $12.99 |
| Pirate Latitudes | Michael Crichton | HarperCollins | $27.99 | $14.00 | $9.99 | $9.99 | |
| Ford County | John Grisham | Random House | $24.00 | $11.00 | NA | NA | |
| U is for Undertow | Sue Grafton | Penguin | $27.95 | $14.96 | $9.99 | $9.99 | $12.99 |
| The Last Song | Nicholas Sparks | Hachette | $24.99 | $12.96 | $8.80 | $8.80 | |
| The Christmas Sweater | Glenn Beck | Simon & Schuster | $19.99 | $11.97 | $9.99 | $9.99 | |
| Breathless | Dean Koontz | Random House | $28.00 | $14.00 | $9.99 | $9.99 | |
| The Lacuna | Barbara Kingsolver | HarperCollins | $26.99 | $13.00 | $9.99 | $9.99 | |
| True Blue | David Baldacci | Hachette | $27.99 | $13.97 | $9.99 | $9.99 | |
| Wolf Hall | Hilary Mantel | Macmillan | $27.00 | $11.00 | $8.80 | $8.80 | |
| The Gathering Storm | Robert Jordan | Macmillan | $29.99 | $17.54 | NA | NA | |
| Half Broke Horses | Jeannette Walls | Simon & Schuster | $26.00 | $14.46 | $9.99 | $9.99 | |
| Pursuit of Honor | Vince Flynn | Simon & Schuster | $27.99 | $12.47 | $8.00 | $8.00 | |
| The Scarpetta Factor | Patricia Cornwell | Penguin | $27.95 | $14.97 | $9.99 | $9.99 | $12.99 |
| The Girl Who Played with Fire | Stieg Larsson | Random House | $25.95 | $13.00 | $7.99 | $7.99 | |
| The Wrecker | Clive Cussler | Penguin | $27.95 | $15.97 | $9.99 | $9.99 | $12.99 |
| South of Broad | Pat Conroy | Random House | $29.95 | $16.97 | $9.99 | $9.99 | |
| Last Night in Twisted River | John Irving | Random House | $28.00 | $15.97 | $9.99 | $9.99 | |
| Too Much Happiness | Alice Munro | Random House | $25.95 | $15.17 | $9.99 | $9.99 | |
| Nanny Returns | Emma McLaughlin | Simon & Schuster | $25.00 | $14.39 | $9.99 | $9.99 | |
| Too Much Money | Dominick Dunne | Random House | $26.00 | $15.21 | $9.99 | $9.99 | |
| Her Fearful Symmetry | Audrey Niffenegger | Simon & Schuster | $26.99 | $13.49 | $5.79 | $5.79 | |
| Heat Wave | Richard Castle | HarperCollins | $19.99 | $11.69 | $9.99 | $9.99 | |
| Divine Misdemeanors | Laurell K. Ballantine | Random House | $26.00 | $14.97 | $9.99 | $9.99 | |

20

The publishers found Apple's proposed prices too low.  PX-537
(JA___).  Hachette's Nourry stated that he was "reluctant to fix[] best
seller prices at 12$90 [sic]" as Apple desired, "because it may be our last
chance to bring it back up to say 14$99 [sic]."  Dkt.326.64; PX-562
(JA___, ___).  Hachette, Penguin, Simon & Schuster, and HarperCollins
asked Apple for higher prices.  Dkt.326.61-62; PX-26, 49, 76, 174, 484
(JA___-___, ___, ___-___, ___, ___, ___).

On January 16, Cue sent the publishers revised caps that provided
for "higher prices."[8]  Dkt.326.63; PX-59, 120, 511, 512, 513 (JA___, ___,
___, ___, ___, ___); *see also* Tr. 1733:18-23 (JA__).  Although those prices
were lower than the publishers wanted, Cue stressed that this was "the
best chance for publishers to challenge the 9.99 price point."
Dkt.326.52; PX-521 (JA___, ___-___).  The publishers agreed.  As
Penguin Vice President Tim McCall recognized, Apple's price caps –

---

[8] This new pricing schedule decreased the hardcover triggers for the
$12.99 and $14.99 price tiers to $27.50 and $30.  Apple also added price
tiers with caps of $16.99 ($30.01-$35 hardcover) and $19.99 ($35.01-$40
hardcover), but carved out New York Times Bestsellers.  A Bestseller
listed for $30 (hardcover) would still be capped at $12.99, and a
Bestseller listed for $30-$35 would still be capped at $14.99.  Dkt.326.62
(JA___).

somewhere between then-current selling prices and the prices the publishers desired – were "probably the middle ground where compromise is going to have to happen."  Dkt.326.65; PX-584 (JA___, ___).

### 5.  Apple And The Publisher-Defendants Reassure One Another That They Are Acting Together

To force Amazon to move to agency, the publishers had to issue it an ultimatum: Amazon could agree to agency or the publishers would withhold ebooks.  *See, e.g.*, PX-106, 503, 637, 835¶45, 837¶27-28 (JA___, ___, ___, ___, ___).  The publishers were concerned that any single publisher who issued that ultimatum would face "retribution" – "the actual extreme of [Amazon] not putting our books up for sale."  Tr. 348:5-13, 436:5-17, 984:20-25 (JA___, ___, ___).  If the publishers presented a unified front, however, it was less likely that any one publisher would be singled out.  Tr. 541:17-542:23 (JA___-___).  To "take the fear awa[y] of the Amazon retribution that they were all afraid of," Cue reassured the Publisher-Defendants "that they weren't going to be alone."  Dkt.326.118; Tr. 1758:6-18 (JA___, ___); *see also* PX-18, 20, 28, 303, 707 (JA___, ___, ___-___, ___-___, ___-___).  The Publisher-Defendants likewise reassured each other.  *See infra* 24-26.

22

The morning of Apple's initial deadline for the publishers to commit to agency (January 21, 2010), Simon & Schuster's Reidy emailed Cue to get "an update in herding us cats."  PX-782 (JA___).  Cue learned that day that Random House would not sign.  Dkt.326.73; PX-42 (JA___, ___-___).  Undeterred, he told the Publisher-Defendants that the iBookstore would open if four or five publishers signed on.  Dkt.326.74; PX-562 (JA___-___, ___).

Later that day, Cue informed Macmillan's Sargent that one publisher had agreed and that two others were "very close."  Dkt.326.76; PX-84 (JA___, ___).  Minutes later, he sent an almost identical email to Penguin CEO David Shanks.  Dkt.326.76; PX-18 (JA___, ___-___).  Penguin would not agree to agency unless four major publishers were on board, PX-29; Tr. 358:23-359:7 (JA___, ___), and so Cue told Shanks that he had three publishers on board already and that "[i]t would be a huge mistake to miss this if we have 3," PX-29 (JA___).

Meanwhile, Cue suggested to Jobs that he call James Murdoch of News Corp, HarperCollins's parent company, to tell him that other publishers had signed "so there is no leap of faith here."  Dkt.326.78; PX-30 (JA___, ___).  Jobs called and emailed Murdoch over the next few

23

days, and reassured him that "we have 4 of the 6 big publishers signed

up already." Dkt.326.80; PX-32-5 (JA___, ___). He urged Murdoch to

"[t]hrow in with [A]pple and see if we can all make a go of this to create

a real mainstream ebooks market at $12.99 and $14.99," rather than

"[k]eep going with Amazon at $9.99." Dkt.326.81; PX-32 (JA___, ___).

On January 23, Cue emailed Brian Murray, HarperCollins's CEO, that

"we have 4 publishers completed so it is real shame" not to have

HarperCollins on board. Dkt.326.81; PX-507; PX-718 (JA___, ___, ___).

Apple also successfully encouraged the publishers to reassure one

another. Between January 19 and 21, 2010, Murray, Reidy, Shanks,

Young, and Sargent called each other 34 times – 27 calls on January 21

(the date of Apple's initial deadline) alone.[9] Dkt.326.74; PX-788-3-4

(JA___, ___-___). When Macmillan's Sargent emailed Cue on January

21, expressing hesitation about signing Apple's agency agreement,

---

[9] Despite this "web of telephone calls" among the publisher CEOs around each "turning point" in the execution of the agency agreements, with calls increasing on or around critical dates, Dkt.326.119 (JA___), the CEOs denied discussing the Apple agreement with one another or even that any conversations took place. The district court found that those denials, "in the face of overwhelming evidence to the contrary, strongly support[] a finding of consciousness of guilt." Dkt.326.119n59 (JA___).

PX-37 (JA___), Cue called Reidy and Murray.  Cue and Reidy spoke by telephone for more than twenty minutes.  Dkt.326.72; PX-788-4 (JA___, ___).  Immediately after speaking to Reidy, Cue called Murray, who returned the call later that day and talked with Cue for more than ten minutes.  Dkt.326.73; PX-788-4 (JA___, ___).  Cue then immediately called Sargent, who quickly called Murray and Reidy, talking to them for eight and fifteen minutes.  Dkt.326.72; PX-788-4 (JA___, ___).  The next day, Cue reported to Jobs that he had a signing commitment from Macmillan (and others).  Dkt.326.75; PX-28 (JA___, ___).

Penguin remained hesitant on January 25, 2010.  Dkt.326-77; PX-19 (JA___, ___).  Cue called its CEO, Shanks, and the two spoke for twenty minutes.  Dkt.326-77; PX-788-6 (JA___, ___).  Less than an hour later, Shanks called Reidy.  Dkt.326-77; PX-788-6 (JA___, ___).  By that afternoon, Penguin had signed an agency agreement.  PX-2-12 (JA___).

HarperCollins was the last to sign.  It too needed reassurance from the other publishers, and Murray made a round of telephone calls to the other Publisher-Defendants before signing.  Dkt.326.81; PX-788-4-6 (JA___, ___-___).  As Murray testified at trial, he wanted to confirm that Cue was telling him the truth that four other publishers had signed on.

Tr. 1006:9-1007:17 (JA___-___).  Murray feared "Amazon[']s reaction,"

but as the fifth publisher to sign, he hoped the reaction would be

"muted."  Dkt.326.82; PX-526 (JA___, ___).

### 6. After Signing The Apple Agency Agreements, The Publisher-Defendants Move All Retailers To Agency

Apple knew that the Publisher-Defendants would promptly move

Amazon to agency and raise retail prices.  At the January 27, 2010,

launch of the iPad, Steve Jobs demonstrated how to use the iBookstore

to purchase an ebook – *True Compass*, by Senator Edward Kennedy.

Although *True Compass* sold at Amazon for $9.99, Jobs previewed the

iBookstore sale at $14.99.  Dkt.326.85; PX-607 (JA___, ___-___).  In a

recorded conversation, a reporter from *The Wall Street Journal* asked

why consumers would pay Apple $14.99 when the same title sold at

Amazon for $9.99.  PX-615 at 1:57 (JA___).  Jobs responded:  "That

won't be the case."  *Id.*  The reporter sought to clarify: "You mean you

won't be 14.99 or they won't be 9.99?"  *Id.*  Jobs paused, "and with a

knowing nod responded, '[t]he price will be the same.'"  Dkt.326.85;

PX-615 at 2:11 (JA___, ___).  He then explained that publishers were

"not happy" with Amazon's $9.99 price, and were "actually

withhold[ing] their books from Amazon" because of it.  *Id.*

Jobs was right.  The Publisher-Defendants moved swiftly after the January 27 iPad announcement to impose the agency model and raise prices.  HarperCollins emailed Amazon on January 27 to say that it was moving all New Release ebooks to the agency model and had "reached an agreement with our first agent, Apple," the night before. Dkt.326.83-84; PX-728; PX-835¶43 (JA___-___, ___, ___).  Penguin called Amazon that day to explain that it had moved to agency with its "first customer" – Apple.  Dkt.326.84; PX-835¶43 (JA___, ___).

Macmillan was the first publisher to give Amazon an ultimatum. Sargent told Cue that Sargent would skip the iPad launch to travel to Seattle.  Dkt.326.86; PX-881 (JA___, ___).  As he told a friend, he was going there "to get [his] ass kicked by Amazon."  Dkt.326.87; PX-79; Tr. 1139:8-21 (JA___, ___, ___).  On January 28, Sargent told Amazon executives that, if they did not move to agency, they would not receive ebook titles until seven months after their initial release.  Dkt.326.87; PX-835¶45 (JA___, ___).

As the publishers had feared, Amazon retaliated immediately by removing the "buy buttons" for Macmillan's print and electronic books so that customers could see, but not purchase, those books, Dkt.326.87;

Tr. 633:25-634:2 (JA___, ___-___).  The publishers nonetheless felt

confident issuing ultimatums to Amazon because they knew they were

acting together.  As Sargent said later that week, "[t]he optics make it

look like I stood alone, but in the end I had no doubt that the others

would eventually follow."  Dkt.326.88; PX-94; Tr. 1165:16-1166:1

(JA___, ___, ___-___).  Hachette's Nourry assured Sargent, "you are not

going to find your company alone in the battle" with Amazon.

Dkt.326.88-89; PX-91; Tr. 1161:8-19 (JA___-___, ___, ___); *see also*

PX-884.200-01 (JA___-___).

Although Amazon initially resisted the Publisher-Defendants'

demands, it capitulated once it understood that the five Publisher-

Defendants stood together in threatening to withhold ebooks if Amazon

did not agree to agency.  Amazon's Grandinetti explained that, "[i]f it

had been only Macmillan demanding agency, we would not have

negotiated an agency contract with them.  But having heard the same

demand for agency terms coming from all the publishers in such close

proximity . . . we really had no choice but to negotiate the best agency

contracts we could with these five publishers."  Dkt.326.89-90;

PX-835¶¶46,47 (JA___, ___).  On January 31, Amazon announced that

28

it would accept agency terms.  Dkt.326.90; Tr. 636:15-18 (JA___, ___).

Amazon negotiated a different termination date for each agency

agreement, however, in order to avoid future simultaneous negotiations

with the Publisher-Defendants.  Dkt.326.91; Tr. 759:12-760:2 (JA___,

___-___).

At trial, Cue admitted that Apple "expected" the Publisher-

Defendants to move Amazon to agency, but denied "knowing" that they

would.  Dkt.326.84n47; Tr. 1765:2-20 (JA___, ___).  The district court

found that this testimony was not credible.  Dkt.326.84n47  (JA___).

Cue claimed that he had no advance knowledge of Sargent's Amazon

meeting, Tr. 1773:3-6 (JA___), even though Sargent had emailed him

about his trip to Seattle days before the meeting took place, PX-881

(JA___).  On January 28, the day of the meeting, Jobs told his

biographer that the Publisher-Defendants "went to Amazon and said,

'You're going to sign an agency contract or we're not going to give you

the books.'"  Dkt.326.103-04; PX-514 at 503-04 (JA___-___, ___-___).

Saul and Cue closely monitored the ensuing Amazon-Macmillan

dispute, with Sargent making sure that Cue was "in the loop," PX-101

(JA___-___).  Cue provided Sargent advice on the dispute, responding to

Sargent's "URGENT!!" request by instructing Sargent to "[c]all me on my cell."  PX-53; Dkt.326.90 (JA___, ___).

The Publisher-Defendants also quickly moved the remaining retailers to agency.  Some retailers readily accepted agency terms, as the new model meant they would no longer have to face aggressive price competition from Amazon.  Others, such as Google, valued the ability to compete on price and saw their businesses as hampered by the inability to freely market and promote ebooks.  Dkt.326.101-02; PX-838¶¶3-7 (JA___-___, ___-___).  Regardless of a particular retailer's preference, however, the Publisher-Defendants advised retailers that the Apple agreements did not allow them to continue offering their ebooks under wholesale terms.  PX-836¶16, 838¶3 (JA___, ___).

### 7.  Ebook Prices Rise To The Price Caps

Immediately after the iBookstore opened and Amazon and other retailers were forced to switch to the agency model, ebook prices "shifted upward, in some cases 50% or more for an individual title." Dkt.326.12.  At Apple, the Publisher-Defendants priced 99.4% of New York Times Bestsellers and 92.1% of New Releases within 1% of the applicable price cap.  Dkt.326.94; PX-1105¶141 (JA___, ___-___).  At

30

Amazon, the Publisher-Defendants priced 96.8% of New York Times Bestsellers and 85.7% of New Releases within 1% of the applicable price cap. Dkt.326.94; PX-1105¶141 (JA___, ___). At Amazon, this translated to a 14.2% price increase for new releases and a 42.7% price increase for New York Times Bestsellers. Dkt.326.94; PX-1105¶149 (JA___, ___). Across their entire ebook catalogs – roughly 50% of the trade ebook market – Publisher-Defendants' titles increased in price by 18.6%. Dkt.326.94; PX-1105¶149 (JA___, ___); *see also* Tr. 1689:25-1691:16 (JA___, ___-___). Prices for other publishers' ebooks remained flat. *Id.* Consumers also lost the benefit of traditional book promotions, which the Publisher-Defendants – who had "worked hard to push the price of our new Ebooks up just a few dollars" – were now more reluctant to authorize. Dkt.326.99; PX-315 (JA___, ___).

The Publisher-Defendants naturally sold fewer ebooks as a result. Dkt.326.97 (JA___). According to a study comparing sales of books available in the two-week periods before and after the April 2010 switch to agency, the Publisher-Defendants who switched at that time sold 12.9% fewer units after switching. Dkt.326.97; PX-1105¶70 (JA___, ___). In contrast, non-party publishers' sales *increased* by 5.4% during

31

that time.  *Id.*  According to another study, the Publisher-Defendants'
sales decreased by 14.5% relative to Random House, which had not
switched to agency by then.  Dkt.326.97; PX-1097¶10 (JA___, ___).

The Publisher-Defendants also raised some hardcover list prices in
order to move the ebook versions of particular titles into higher price
tiers.  Dkt.326.95-96; DX-449 (JA___-___, ___).  They also raised the
prices of their backlist ebooks.  *Id.*  As Cue had anticipated, they did
this, at least in part, to make up for the lower payments from retailers
on New Release ebooks.  Dkt.326.95-96; Tr. 1949:24-1954:17; PX-894
(JA___-___, ___-___, ___-___).

Apple's expert acknowledged at trial that prices for the Publisher-
Defendants' ebooks had gone up as expected after Apple opened the
iBookstore.  Dkt.326.99; Tr. 2236:5-2238:5 (JA___, ___-___).  As the
district court explained, "consumers suffered in a variety of ways from
this scheme to eliminate retail price competition and to raise e-book
prices.  Some consumers had to pay more for e-books; others bought a
cheaper e-book rather than the one they preferred to purchase; and it
can be assumed that still others deferred a purchase altogether rather
than pay the higher price."  Dkt.326.98 (JA___).

32

## B. The Publisher-Defendants Settle And Apple Is Found Liable After Trial

The Publisher-Defendants settled before trial, entering into similar consent decrees, later approved by the district court,[10] that limited for two years their ability to restrict retailers from discounting ebooks.[11] Apple proceeded to a bench trial on liability and injunctive relief. The parties consented to Judge Cote's standard bench trial procedures, *see* http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=656, including admission of direct testimony via affidavit from witnesses under a party's control, with live testimony limited to cross-examination and redirect examination. Dkt.78.61-65 (JA___-___). On April 26, 2013,

---

[10] Bob Kohn, an amicus supporting Macmillan and Simon & Schuster, opposed the consent decrees in the United States' case and unsuccessfully sought to intervene to appeal their entry. Kohn appealed the denial of his motion, which this Court summarily affirmed. *United States v. Apple, Inc.*, No. 12-4017 (2d Cir. Mar. 26, 2013). Kohn also opposed entry of the Plaintiff-States' settlement agreements and again unsuccessfully sought intervention to appeal their entry. Kohn sought to appeal both the entry of the agreements and the intervention denial, but this Court once again summarily affirmed the district court. *State of Arizona v. Macmillan, Inc.*, No. 13-4828 (2d Cir. May 7, 2014).

[11] The Publisher-Defendants agreed to the same injunctive relief in the United States' and Plaintiff-States' cases. The Plaintiff-States' settlements also involved monetary payments.

the parties submitted direct-testimony affidavits from fact and expert witnesses, exhibits, deposition transcripts, memoranda of law, proposed findings of fact, and proposed conclusions of law.

On May 23, 2013, the district court, at the parties' joint request, offered "tentative" thoughts on the parties' submissions. Dkt.265.47-49; Tr. 80:19-84:4 (JA___-___, ___-___). The court did so to aid the parties in their live presentations, which began on June 3, 2013. The court heard opening statements, as well as cross-examination and re-direct examination of the witnesses. Counsel presented closing arguments on June 20, 2013.

On July 10, 2013, the district court issued a 160-page opinion and order, with 100 pages of fact findings, including the finding "that the Publisher Defendants conspired with each other to eliminate retail price competition in order to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy." Dkt.326.9 (JA___). The court concluded that the conspiracy – "at root, a horizontal price restraint" – was *per se* unlawful. Dkt.326.153 (JA___). In the alternative, the court found the conspiracy unlawful under the rule of reason because it harmed competition and its purported benefits – the

"launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally" – were "independent" of the conspiracy.  Dkt.326.121 (JA___).

Lengthy proceedings on remedy followed, with several proposals, multiple rounds of briefing, extensive discussions between the parties, and two court hearings.  On September 5, 2013, the district court entered a Final Judgment and Permanent Injunction.  Dkt.374 (JA___-___).  The Injunction prohibits Apple from agreeing with the Publisher-Defendants to restrict its ability to discount ebook prices.  Dkt.374.IIIC (JA___).  That restriction expires at six-month intervals for the five Publisher-Defendants: with Hachette after two years, HarperCollins after two and a half years, Simon & Schuster after three years, Penguin after three and a half years, and Macmillan after four years.  *Id.*  As the court explained, "[t]his means that there would be no one point in time when Apple would be renegotiating with all of the publisher defendants at once.  And no one point in time when the publisher defendants could be assured that it was taking the same bargaining position as its peers vis-a-vis Apple."  Dkt.356.65:21-25 (JA___).

The Injunction also prohibits Apple from discriminating against ebook applications in its "App Store," Dkt.374.IVB (JA___), to ensure that Apple does not use "the app store . . . as an engine of retaliation" or as "a back doorway for introduction of an agency agreement," Dkt.356.63:1-8 (JA___).

Finally, the Injunction provides for an external monitor to evaluate Apple's antitrust training and compliance programs.  The district court explained that the record showed "a blatant and aggressive disregard at Apple for the requirements of the law."  Dkt.371.17:1-2 (JA___).  The court gave Apple several opportunities to show that it could prevent future violations on its own, but Apple failed to do so.  Dkt.371.17:7-16 (JA___).  Nonetheless, so that the monitorship would "rest as lightly as possible on the way Apple runs its business," Dkt.371.8:25-9:1 (JA___-___), the court gave the monitor only limited powers to evaluate whether Apple's antitrust compliance and training programs are "reasonably designed to detect and prevent violations of the antitrust laws," Dkt.374.VIB-D (JA___-___).  On October 16, 2013, the court appointed Michael Bromwich, formerly Inspector General of the Justice

Department, as monitor and Bernard Nigro, chair of the Fried Frank antitrust practice, to assist him.  Dkt.384 (JA___-___).

Apple (Nos. 13-3741 and 3857), Macmillan (Nos. 13-3748 and 3783), and Simon & Schuster (Nos. 13-3864 and 3867) appealed.  Those appeals have been consolidated.

On December 13, 2013, Apple asked the district court to stay the monitorship, arguing that it was unconstitutional and violated Federal Rule of Civil Procedure 53.  Dkt.417 (JA___-___).  In its reply brief, Apple also asked the court to disqualify the monitor.  Dkt.427 (JA___-___).  The court denied Apple's requests, finding its arguments waived and meritless.  Dkt.437 (JA___-___).  Apple appealed that order (Nos. 14-60 and 61).  Apple's revised opening brief in that appeal was filed on May 15, 2014, and Plaintiffs' response is due August 14, 2014.

Apple sought an emergency stay of the monitorship in both appeals. This Court denied the stay on February 10, 2014.

Apple's jury trial on the Plaintiff-States' damages claims was scheduled for July 2014.  On April 23, 2014, Apple sought an emergency stay of the Plaintiff-States' damages trial pending appeal.  Oral argument on the stay request is scheduled for May 29, 2014.

## SUMMARY OF ARGUMENT

Apple, led by its highest-level executives, orchestrated and participated in a conspiracy among ebook publishers to eliminate retail price competition and to fix and raise ebook retail prices. Apple acted with a "blatant and aggressive disregard" for the law, Dkt.371.17:1-2 (JA___), and the self-serving denials of its executives were not credible. On appeal, Apple disregards both the law and the facts and never fully confronts the district court's amply supported and well-reasoned decision finding it liable for *per se* illegal horizontal price fixing.

I.A. Apple's pitch to the Publisher-Defendants, from beginning to end, was for a collective solution to the Amazon $9.99 problem. With Apple's coordination, "all publishers" could collectively move "all retailers" to agency and thus control and raise ebook retail prices. Such an agreement among the competing Publisher-Defendants is *per se* illegal horizontal price fixing. That Apple helped the Publisher-Defendants to collude does not insulate the conspiracy from *per se* condemnation or immunize Apple for its participation in the illegal scheme. Nor does Apple get a free pass because it fixed prices at the

same time it opened the iBookstore; the purpose of the conspiracy was not to expand retail price competition, but to eliminate it.

B. Plaintiffs proved through compelling evidence both the horizontal conspiracy among the Publisher-Defendants and Apple's participation in and orchestration of that conspiracy. Apple knew that helping the Publisher-Defendants to solve the Amazon problem would benefit Apple by eliminating retail price competition, raising ebook prices, and securing for itself a 30% commission. Moreover, Apple knew that the Publisher-Defendants would sign its proposed agency agreements only if they were all – Apple included – committed to raising ebook prices. Apple therefore reassured the Publisher-Defendants that they were not alone and encouraged them to reassure one another.

On appeal, Apple fails to establish clear error in the district court's finding that Apple conspired with the Publisher-Defendants to fix ebook prices. Indeed, Apple all but ignores this Court's deferential standard of review of fact findings, failing even to mention the many credibility findings upon which the district court's decision rested.

Instead, Apple first attacks a finding the court never made – that Apple joined a pre-existing conspiracy. Next, it pretends that the

district court condemned a series of vertical distribution agreements. The court was clear, though; even if the agency agreements were not unlawful on their own, it was unlawful for Apple to conspire with the Publisher-Defendants to raise ebook prices through the terms of the agency agreements. Finally, Apple invents a new higher burden for antitrust plaintiffs when a defendant acts in its own interest. But compelling direct and circumstantial evidence established that Apple and the Publisher-Defendants colluded to raise ebook prices precisely because it was in all of their interests to do so.

II. The district court properly found that the conspiracy was also illegal under the rule of reason because it eliminated retail price competition and raised ebook prices. Apple derides what it calls the court's "one-paragraph" rule of reason analysis, but disregards the court's lengthy discussion of the conspiracy's history, purpose, and effect, including a careful analysis of its price effects. Immediately after the switch to agency, the Publisher-Defendants (with about half of relevant sales) raised ebook prices by almost 20%, while other publisher's prices remained flat. Apple's own expert conceded that overall prices went up.

While Apple claims the conspiracy had procompetitive benefits, its own witnesses conceded the lack of connection between the conspiracy and these purported benefits.  The iBookstore did not improve retail competition; post-conspiracy, there was less competition, not more.

III. The district court properly excluded opinions of Apple's expert, Dr. Michelle Burtis.  Her data showed a decline in average ebook prices between the two-year periods before and after the iBookstore launch, but she did not explained her opinion that the conspiracy caused this purported price decline.  Apple provides no more explanation on appeal. In any event, the court carefully reviewed the excluded opinions and admitted the underlying data, which were only a small part of a record that clearly demonstrates the conspiracy's anticompetitive effects.

IV. Apple waives its nonetheless meritless remedy arguments – including those that formed the basis of its emergency stay motion in this Court – by devoting only a single conclusory sentence to them.

The Injunction did not amend the Publisher-Defendants' consent decrees.  Nor was estoppel appropriate, as the court *sua sponte* and reasonably determined that Apple should not be able to coordinate the Publisher-Defendants by negotiating their contracts simultaneously.

41

## STANDARD OF REVIEW

On appeal following a bench trial, this Court reviews findings of fact for clear error. Fed. R. Civ. P. 52(a)(6); *Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1098 (2d Cir. 1988). Fact findings, such as a finding of conspiracy and a defendant's participation therein, are overturned only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *Krieger*, 863 F.2d at 1098 (internal quotations omitted). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (internal quotations omitted). When a court's decision rests on credibility determinations, "even greater deference is required." *Id.*

This Court reviews conclusions of law *de novo. Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 890 (2d Cir. 2011). It reviews for abuse of discretion both the exclusion of expert testimony, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d

42

206, 212-13 (2d Cir. 2009), and the "fashioning of equitable relief,"

*Abrahamson v. Bd. of Educ.*, 374 F.3d 66, 76 (2d Cir. 2004).

## ARGUMENT

## I. Apple And Five Book Publishers Conspired To Fix Ebook Prices – A *Per Se* Violation Of The Sherman Act

Plaintiffs demonstrated through "compelling direct and circumstantial evidence" that Apple, led by its highest-level executives, "participated in and facilitated a horizontal price-fixing conspiracy." Dkt.326.120 (JA___).  That price-fixing conspiracy is *per se* unlawful under Section 1 of the Sherman Act, and Apple is liable for it.

Apple does not confront the district court's key findings of fact. Instead, it asserts that Apple, indifferent to the publishers' desire for higher retail prices, made several innocent vertical distribution agreements whose only purpose was to facilitate Apple's procompetitive entry into the ebook market.  That characterization of the relevant events cannot be reconciled with the evidence presented at trial, which demonstrated that Apple had conspired with the publishers to achieve their shared goal of eliminating ebook retail price competition and raising ebook prices.  Apple proposed that "all publishers" move "all retailers" to agency; fashioned an "elegant solution" (in the form of the

MFN) that effectively compelled participating publishers to move other retailers to agency as well; created pricing tiers for the Publisher-Defendants to fix uniform higher ebook prices; and reassured the Publisher-Defendants that they were acting together.

Apple's legal arguments are also unsound. Contrary to Apple's contentions, its use of vertical agreements with the Publisher-Defendants does not shield it from *per se* liability for orchestrating and participating in a conspiracy with those publishers (who were competitors of each other) to eliminate retail price competition and raise ebook prices. Nor can Apple insulate itself from *per se* liability by claiming (incorrectly) that this price-fixing agreement had procompetitive benefits.

## A. The Horizontal Conspiracy To Fix Ebook Retail Prices Is *Per Se* Unlawful

Although Section 1 of the Sherman Act literally encompasses "every contract, combination . . . , or conspiracy, in restraint of trade," 15 U.S.C. § 1, it is understood to prohibit only "unreasonable restraints," *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988). Judgments about reasonableness are generally made case-by-case. Some restraints, however, "because of their pernicious effect on

44

competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co., v. United States*, 356 U.S. 1, 5 (1958). Those restraints are *per se* unlawful.

An agreement among competitors – that is, a horizontal agreement – to fix prices is the "archetypal example" of a *per se* unlawful agreement. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). It is "the supreme evil of antitrust." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Because price is the "central nervous system of the economy, . . . an agreement that interferes with the setting of price by free market forces is illegal on its face." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (internal quotations omitted). In such cases, "no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940).

In this case, Plaintiffs proved that Apple and the competing Publisher-Defendants had agreed on a scheme to eliminate retail price

45

competition and raise ebook prices. *See infra* 54-82. Apple orchestrated

that horizontal conspiracy. The conspiracy constitutes price fixing and

is *per se* unlawful under the Sherman Act.

### 1. Apple's Participation Does Not Exempt This Horizontal Price-Fixing Conspiracy From *Per Se* Treatment

The conspiracy in this case "was horizontal because it was 'the

product of a horizontal agreement'" among the competing Publisher-

Defendants. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217,

1220 (7th Cir. 1993) (quoting *Business Electronics*, 485 U.S. at 730 n.4).

Participation by a party vertically related to the conspiring competitors

does not lessen the anticompetitive dangers inherent in a horizontal

price-fixing conspiracy. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

300, 338 (3d Cir. 2010). Nor does that participation transform the

horizontal conspiracy into a series of vertical restraints subject to the

rule of reason. *Denny's Marina*, 8 F.3d at 1220.

Indeed, a vertically related party like Apple can "induc[e] the

[competitors] to collude, rather than to compete independently." *Toys

"R" Us, Inc., v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000). Apple and the

Publisher-Defendants "cannot escape the per se rule simply because

their conspiracy depended upon the participation of a 'middle-man',

46

even if that middleman conceptualized the conspiracy, orchestrated it . . . , and collected most of the booty." *United States v. All Star Indus.*, 962 F.2d 465, 473 (5th Cir. 1992); *accord Insurance Brokerage*, 618 F.3d at 337; *see also United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990) ("[I]f there is a horizontal agreement between [competitors], there is no reason why others joining that conspiracy must be competitors.").

"Every person" who participates in a conspiracy in restraint of trade violates Section 1.  15 U.S.C. § 1.  If a conspiracy is *per se* unlawful, all participants – competitors and non-competitors alike – are liable.  *See Insurance Brokerage*, 618 F.3d at 337 (defendant insurance broker orchestrated bid-rigging conspiracy with competing insurers); *Toys "R" Us*, 221 F.3d at 934-36 (defendant toy store orchestrated group boycott with competing toy manufacturers); *Denny's Marina*, 8 F.3d at 1221-22 (defendant boat show operators joined price-fixing conspiracy with competing boat dealers).

The use of vertical restraints, such as agency agreements, price caps, and MFNs, to facilitate and implement a horizontal price-fixing conspiracy does not insulate the horizontal conspiracy from the *per se*

rule.  In antitrust law, as in the law of conspiracy generally, "[a]cts done to give effect to the conspiracy may be in themselves wholly innocent acts." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). Standing alone, vertical restraints are analyzed under the rule of reason to determine whether they are anticompetitive; but a horizontal conspiracy implemented through vertical agreements is *per se* unlawful. *Toys "R" Us,* 221 F.3d at 934-36.

Contrary to Apple's contentions, Br. 47-49, 53, the district court did not view the individual agency agreements, price tiers, or MFNs as *per se* unlawful, or even as independently "wrongful."  Dkt.326.157 (JA___). Nor does the court's decision discourage the proper use of such restraints.  Br. 1, 23-24, 29; Economist Br. 20-22.  Rather, as the district court explained, "[w]hat was wrongful was the use of those components to facilitate a conspiracy with the Publisher Defendants." Dkt.326.157 (JA___).  For example, Apple used the MFN to ensure that the Publisher-Defendants would insist that Amazon move to an agency model – a critical step if the conspirators were to raise ebook prices.

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), and other vertical-restraint cases on which Apple relies, Br. 47-

48

50, are not to the contrary.  No horizontal price-fixing conspiracy was

alleged in *Leegin*.  And while the Supreme Court held that *vertical*

minimum price agreements were subject to the rule of reason, it

recognized that a "horizontal cartel among compet[itors] . . . that

decreases output or reduces competition in order to increase price is,

and ought to be, *per se* unlawful."  551 U.S. at 893.

The *Leegin* Court also observed that "[t]o the extent a vertical

agreement setting minimum resale prices is entered upon to facilitate

[such a] cartel, it, too, would need to be held unlawful under the rule of

reason."  *Id.* at 893; *see also Toledo Mack Sales & Serv., Inc. v. Mack

Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008).  Read in context, that

statement is best understood to mean that a party who enters into a

vertical agreement that facilitates a horizontal conspiracy, but does not

join the horizontal conspiracy itself, would be subject to liability under

the rule of reason.  The Court in *Leegin* did not suggest that a

horizontal price-fixing conspiracy escapes *per se* condemnation simply

because it is facilitated by a vertical agreement.  Nor did it suggest that

the parties who did join the horizontal conspiracy can escape *per se*

liability simply because they do not compete with their co-conspirators. *See supra* 46-47.

### 2. There Are No Justifications For Horizontal Price Fixing

Apple contends that the horizontal price-fixing conspiracy was actually procompetitive and therefore not *per se* unlawful.  Br. 50-53. That argument ignores the overwhelming evidence that the conspiracy dramatically increased ebook prices, thereby harming consumers, without producing any countervailing procompetitive benefits.  *See infra* 82-92.  More fundamentally, Apple's contention "indicates a misunderstanding of the *per se* concept."  *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).  "The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."  *Id.* at 351-52. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness."  *Socony-Vacuum*, 310 U.S. at 224 n.59.

It is similarly irrelevant to the *per se* rule whether the price-fixing agreement among Apple and the Publisher-Defendants "could reasonably have been believed to promote 'enterprise and productivity.'"

50

Br. 49-50 (quoting *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004,

1011 (7th Cir. 2012)).  The district court here, unlike the lower court in

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 9 (1979), Br. 50, did not

mischaracterize conduct merely sharing some superficial features with

horizontal price fixing.  And *Sulfuric Acid*, Br. 50, concerned "shutdown

agreements," through which U.S. producers of sulfuric acid agreed to

distribute Canadian sulfuric acid instead of their own.  703 F.3d at

1008-09.  The court of appeals in that case affirmed the district court's

refusal to apply the *per se* rule because "the plaintiffs haven't told us

what we would need to know in order to be persuaded by them that the

shutdown agreements are garden-variety price-fixing agreements."  *Id.*

at 1009.  By contrast, after reviewing the totality of the evidence, the

district court here properly found that Apple had participated in a

horizontal price-fixing conspiracy that had the purpose and effect of

raising ebook prices.[12]

---

[12] The decisions that Apple cites addressing the legality of vertical
restraints shed no light on the *per se* illegality of horizontal price-fixing
agreements.  *See* Br. 50 (citing *Toledo Mack*, 530 F.3d at 225; *Gorlick
Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019,
1025 (9th Cir. 2013)).

Apple contends that *per se* condemnation was inappropriate here because "Apple's entry with the iBooks Store into a market 'dominated' by Amazon" had various procompetitive effects. Br. 50-51 & n.5. The introduction of the iPad, and the launch of the iBookstore, did increase the number of options available to consumers for reading and buying ebooks. The purpose and effect of the charged conspiracy, however, were to *prevent* that expansion of the market from resulting in *price competition* among ebook retailers. Indeed, the conspiracy eliminated existing competition, and its immediate effect was that ebook prices increased. *See* Dkt.326.156 (JA___) ("[F]rom the consumer's perspective . . . the arrival of the iBookstore brought less competition and higher prices.").

In any event, a horizontal price-fixing agreement is not rendered lawful, or exempted from *per se* condemnation, simply because one of the conspirators contemporaneously engages in *other* conduct that has procompetitive effects. Rule-of-reason analysis is appropriate where "horizontal restraints on competition are essential if the product is to be available at all," *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 (1984), sometimes even where the restraint can be said to

constitute "'price fixing' in the literal sense," *Broadcast Music*, 441 U.S. at 8.  As the district court explained, however, "[t]he pro-competitive effects to which Apple has pointed, including its launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally, are phenomena that are independent of the Agreements and therefore do not demonstrate any pro-competitive effects flowing from the Agreements."  Dkt.326.121 (JA___).  Because the price-fixing conspiracy was "independent of" the introduction of the iPad or the iBookstore, "Apple has not shown that the execution of the Agreements had any pro-competitive effects."  *Id.*

There is likewise no merit to Apple's contentions that *per se* treatment is inappropriate because the conspiracy "eliminated the threat of windowing," Br. 52, or because its price caps prevented still greater price increases, Br. 49.  The record does not indicate either that a serious threat of widespread windowing existed or that price fixing was the only way to end such a threat.  *See infra* 91.  But even if Apple could establish those propositions, it could not escape liability for orchestrating a horizontal price-fixing conspiracy by showing that its co-conspirators would otherwise have engaged in *different* potentially

harmful conduct.  Nor can members of a price-fixing conspiracy escape liability because some of their co-conspirators wanted to fix prices even higher; indeed, it is no defense that "the prices fixed are themselves reasonable," *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) (internal quotations omitted).

Amicus Kohn claims that the conspiracy could be justified as challenging Amazon's allegedly "below marginal cost pricing." Kohn Br. 7.  But complaints about ruinous price-cutting have never justified price fixing, *see* Dkt.326.157 (JA___) ("Another company's alleged violation of antitrust laws is not an excuse for engaging in your own violations of law."), and allowing an inquiry into the reasonableness of the prices fixed would eviscerate the *per se* rule, *Socony-Vacuum,* 310 U.S. at 220-21; *see also Superior Court Trial Lawyers*, 493 U.S. at 421 (group boycott *per se* unlawful even if "preboycott rates were unreasonably low" and the rate increase improved quality).

## B.  The Evidence Proved That Apple Participated In A Horizontal Price-Fixing Conspiracy

To prevail on a claim of horizontal price fixing, Plaintiffs had to prove that Apple and two or more publishers conspired to raise and fix

ebook prices.  The district court found the evidence of such an

agreement "overwhelming," Dkt.326.137 (JA___), and Apple identifies

no sound reason to reject that finding.

Apple contends that the "bedrock of the [district] court's entire

decision" was that "Apple 'willingly joined' a pre-existing publisher

conspiracy" in mid-December 2009, and it asserts that this supposed

finding is "demonstrably wrong."  Br. 17.  The district court did find

that, when Apple initiated its discussions with the Publisher-

Defendants that month, Apple knew that the publishers were

pressuring Amazon to abandon the $9.99 price.  Dkt.326.10 (JA___).

The court did not suggest, however, that as of that date, the Publisher-

Defendants had formed (or even conceived of) the specific price-fixing

conspiracy, implemented through the shift from the wholesale to the

agency model, that was ultimately alleged and proved in this case.  To

the contrary, the court concluded that "[w]ithout Apple's orchestration

of this conspiracy, it would not have succeeded as it did."  Dkt.326.9

(JA___).  The district court's references to Apple as "join[ing]" the

Publisher-Defendants' conspiracy, Dkt.326.113,129 (JA___, ___),  simply

reflect the court's conclusion that Apple was a *member* (indeed, an

orchestrator) of the conspiracy, not simply a retailer that executed vertical agreements with the conspirators.  As explained below, contemporaneous documents and witness testimony demonstrated that Apple and the Publisher-Defendants shared a common goal to eliminate retail price competition and raise ebook prices; that Apple presented a strategy to achieve that goal collectively; and that the Publisher-Defendants all agreed to the strategy.

The district court also found that several witnesses from Apple and the Publisher-Defendants were "noteworthy for their lack of credibility." Dkt.326.143n66 (JA___); *see also* Dkt.326.43n19, 71n38, 84n47, 90n52, 93n53, 119n59 (JA___-___, ___-___, ___, ___, ___, ___).  Their "demeanor changed dramatically depending on whether Apple or the Plaintiffs were questioning them; they were adamant in denials until confronted with documents or their prior deposition testimony; instead of answering questions in a straightforward manner, they would pick apart the question and answer it narrowly or avoid answering it altogether." Dkt.326.143n66 (JA___).  The conspirators' non-credible, self-serving denials further support the district court's factual finding. *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[A]cts that

56

exhibit a consciousness of guilt, such as false exculpatory statements, may also tend to prove knowledge and intent of a conspiracy's purpose.") (internal quotations omitted).

This Court reviews factual findings for clear error, with particular deference to credibility determinations. Apple does not challenge the district court's findings as clearly erroneous. Rather, Apple argues that the district court applied the wrong legal standard to evaluate the evidence, and it attacks the court's interpretation of isolated pieces of evidence. Those arguments are unavailing.

### 1. Plaintiffs Did Not Have A Heightened Burden Of Proof

Apple argues that the district court evaluated the evidence of conspiracy under a "standardless, incoherent approach." Br. 29. Apple is wrong. The district court articulated the proper standard and correctly applied it.

A horizontal price-fixing conspiracy may be found where the "direct or circumstantial evidence . . . reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." Dkt.326.108-09 (JA___-___) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). The Supreme Court

57

has cautioned against inferring agreement from "highly ambiguous evidence" because doing so could deter or penalize legitimate competitive conduct. *Monsanto*, 465 U.S. at 763. Accordingly, evidence that is "as consistent with permissible competition as with illegal conspiracy" is not enough. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (citing *Monsanto*, 465 U.S. at 764).

Contrary to Apple's suggestion, Br. 29-30, however, a plaintiff need not "exclude" or "dispel" *all* possibility of independent action, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 940 (2013). Instead, a plaintiff need only show "sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 14.03(b), at 14-25 (4th ed. 2011)). Whether the evidence in a particular case satisfies that standard depends in part "on the plausibility of the plaintiff's theory." *Publication Paper*, 690 F.3d at 63. Here, the charged conspiracy was more than merely plausible; it made perfect economic sense because Apple and the Publisher-Defendants all had a "rational economic motive," *Matsushita*, 475 U.S. at 596, to

58

conspire to raise ebook prices.  And, as the district court correctly found, "the evidence not only 'tends to exclude the possibility' that Apple acted independently; it overwhelmingly demonstrates that it did not." Dkt.326.131 (JA___).

Apple wanted an ebook retail platform along with the iPad, but it did not want to compete with Amazon on price.  The publishers hated Amazon's pricing and were eager to work together to raise ebook retail prices.  Apple realized that helping the Publisher-Defendants solve the Amazon problem would be to its own benefit by eliminating retail price competition, raising ebook prices, and guaranteeing itself a fixed 30% commission.  The terms that Apple demanded reduced the Publisher-Defendants' per-copy profits from what they had been under the wholesale model, but the Publisher-Defendants were willing to accept that revenue reduction if retail prices went up.

Achieving that goal "required the coordinated effort and conscious commitment of the Publisher Defendants and Apple to change the business model for the distribution of e-books, impose that new model on Amazon against its will, and effect a significant increase in the retail prices of e-books."  Dkt.326.130 (JA___).  The conspirators agreed to an

59

agency model, enabling the Publisher-Defendants to take control of retail prices. Hachette and HarperCollins first proposed agency. Apple embraced it and lobbied other publishers to adopt it.

Apple and the Publisher-Defendants understood that publisher control of prices in the iBookstore would accomplish nothing unless Amazon was moved to an agency model as well. And because no single publisher could move Amazon to agency, coordination among the Publisher-Defendants was essential to attain that objective. Cue reassured the publishers "that they weren't going to be alone." Tr. 1758:6-15 (JA___). The Publisher-Defendants also reassured one another, in a flurry of phone calls in the few days before the agency agreements were signed.

The MFNs in the various publishers' agreements with Apple were both powerful evidence of coordination and a central means by which the publishers' continued commitment to the agency model could be enforced. Any publisher that agreed to an MFN with Apple, while continuing to sell ebooks to Amazon on a wholesale basis, would receive the worst of both worlds: further solidification of the $9.99 price point, but with significantly lower per-book revenues from Apple than the

publishers had historically received from Amazon.  *See supra* 16-17.
Any publisher that accepted Apple's MFN clause was thus effectively
committing itself to shift Amazon to an agency model.

The prior course of dealing among Amazon and the publishers
strongly indicated, however, that no single publisher would confront
Amazon in that manner without assurance that other publishers would
do the same.  Such conduct would risk retaliation from Amazon, *supra*
22, while damaging revenues and business relationships, *see, e.g.*, PX-
506, 526, 719, 1105¶¶62,77 (JA___, ___, ___-___, ___, ___).  The agency
agreements therefore were in each Publisher-Defendant's interest only
if a sufficient number acted together to move retailers to agency and
raise ebook retail prices.  Dkt.326.54-55; PX-1105¶60 (JA___-___, ___-
___).  The fact that five Publisher-Defendants signed the agency
agreements with Apple thus is itself strong evidence of a larger
understanding among them.  *See Interstate Circuit, Inc. v. United
States*, 306 U.S. 208, 223 (1939) (finding it "taxes credulity" that film
distributors would have "accepted and put in to operation with
substantial unanimity . . . far-reaching changes in their business
methods without some understanding that all were to join").  And, for

substantially the same reasons, those agreements once signed created a powerful incentive for the publishers to stay the course, even at the cost of incurring Amazon's displeasure.

As Hachette's Nourry explained, the ultimate purpose of shifting retailers to agency was to ensure that "people all have the same prices." Dkt.326.64; PX-884-164 (JA___, ___).  Here as well, Apple played a central role, proposing and negotiating the same pricing tiers and price caps with all of the Publisher-Defendants.  Immediately after the contracts went into effect, ebook prices went up – in some cases by 50% or more – and the Publisher-Defendants were soon pricing the vast majority of their bestsellers and new releases within 1% of the agreed-upon price caps.

Apple emphasizes that its interests were not identical to the Publisher-Defendants'.  Apple and the Publisher-Defendants all sought revenue from ebook sales, but they also had somewhat different concerns: Apple cared about iBookstore profits and the iBookstore's impact on iPad revenues, while the Publisher-Defendants were worried about the effect of ebook retail prices on consumer perceptions of the

value of print books.  Those differences, however, do not render the evidence ambiguous or weaken the inference of conspiracy.

"Antitrust law has never required identical motives among conspirators." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 215 (3d Cir. 1992).  Here, the record fully supports the district court's conclusion that Apple knowingly orchestrated and facilitated a horizontal price-fixing agreement among the Publisher-Defendants, to the mutual benefit of both the publishers and Apple itself.  Apple wanted to avoid price competition with Amazon and receive a 30% commission on ebook sales; the Publisher-Defendants wanted ebooks to be sold at higher retail prices.  For antitrust purposes, the crucial point is that the conspirators pursued those objectives by a means (the formation of a horizontal price-fixing agreement among competitors) that has historically been treated as *per se* unlawful.  The fact that Apple reaped somewhat different advantages from the agreement than did the Publisher-Defendants is of no legal consequence.

Apple also emphasizes, Br. 11, 22, the district court's observation that the "record is equivocal on whether Apple itself desired higher e-book prices," Dkt.326.151n68 (JA___).  But Apple ignores the district court's follow-on observation that the record "is unequivocal . . . that Apple embraced higher prices so convincingly that the Publishers believed that Apple was content with, and even wanted, higher prices, and that Apple's cooperation with the Publisher Defendants enabled them to raise prices."  *Id.*  Whether or not Apple viewed higher retail prices as an end in themselves, it viewed them as a means toward an end, and so agreed to a scheme to implement them.

Apple's contribution to the collective action was far from "unwitting[]."  Br. 23.  "Apple's pitch to the Publishers was -- from beginning to end -- a vision for a new industry-wide price schedule."  Dkt.326.43-44n19 (JA___-___).  According to Cue, this was "the best chance for publishers to challenge the 9.99 price point."  Dkt.326.52; PX-521 (JA___, ___-___).  And it was Cue who promised the publishers that "they weren't going to be alone."  Tr. 1758:6-15 (JA___).  He and Apple plainly knew what they were doing.

## 2. Participation By Apple – A Vertically Related Entity – Does Not Make The Horizontal Conspiracy Implausible

Evidence that the conspiracy was "masterminded and directed" by Apple – "an entity vertically oriented" to its co-conspirators – "does not make implausible the inference of a horizontal agreement." *Insurance Brokerage*, 618 F.3d at 337. Such evidence merely shows Apple's central role in the horizontal price-fixing conspiracy. Prior to Apple's appearance, the publishers' best efforts had failed to raise the retail price of ebooks. Apple's interest in entering the ebook market gave the publishers the opportunity to wrest control over retail pricing and the means to collude on those retail prices.

The district court found that "with Apple's active encouragement and assistance, the Publisher Defendants agreed to work together to eliminate retail price competition and raise e-book prices, and again with Apple's knowing and active participation, they brought their scheme to fruition." Dkt.326.154 (JA___). In concluding that a horizontal price-fixing agreement existed, and that Apple was liable for participating in it, the court found the decisions involving "hub and spoke" conspiracies "instructive" because they make clear that a "hub" defendant – who does not compete with the "spokes" – can be liable for a

65

horizontal conspiracy provided the competitor "spokes" agreed. Dkt.326.153-54 (JA___-___). The "hub and spoke" cases also make clear that proof of a horizontal agreement need not involve evidence that the competitors communicated directly with each other (though abundant evidence of such communications among the Publisher-Defendants was presented in this case). Rather, it can be sufficient that each competitor enters into a particular agreement with the "hub," with assurance from the "hub" that other competitors are doing the same, and in circumstances where the agreement's appeal to any particular competitor depends on that assurance. *See Toys "R" Us*, 221 F.3d at 935-36; Dkt.326.154 (JA___).

Apple argues that the district court should not have relied on "hub and spoke" cases because Apple did not have the market power necessary to orchestrate a horizontal conspiracy. Br. 25-26. But while a dominant "hub" might use market power to persuade reluctant "spokes" to join a conspiracy, neither logic nor antitrust law requires dominance. A horizontal agreement among competitors is *per se* illegal, regardless of the precise nature of the inducement used to persuade particular entities to join the conspiracy. *Toys "R" Us*, 221 F.3d at 936.

66

In this case, Apple relied not on market dominance, but on the "tight window of opportunity created by the impending launch of the iPad," and on the "Publisher Defendants' fear of and frustration over Amazon's pricing," Dkt.326.11 (JA___), to persuade the Publisher-Defendants to join the conspiracy.  The conspiracy accomplished the complementary goals of raising ebook prices and protecting Apple from retail price competition.  In finding a *per se* Section 1 violation, the district court properly relied in part on the principles announced in "hub and spoke" cases.

### 3.  The Court Did Not Infer Conspiracy From The Contract Terms Alone, But From The Evidence Of Collusion

Apple argues that the district court improperly inferred a conspiracy from the existence of otherwise legal contract terms and price discussions between a supplier and distributor.  Br. 13, 20-22, 32-33.  The Publisher-Defendants' agreement to the MFN was *suggestive* of conspiracy because agreement to that contractual term effectively committed them to move Amazon to agency as well, yet none of the Publisher-Defendants had historically been willing to challenge Amazon's pricing unilaterally.  And the Publisher-Defendants' agreement to pay Apple's 30% commission was *suggestive* of conspiracy

67

because that committed them to earning less revenue than under the wholesale model, which made sense only if they were buying a solution to the Amazon problem.

The court recognized that the collusively adopted agency agreements, with their MFNs, were the mechanisms for the Publisher-Defendants to take control of ebook retail prices.  Dkt.326.133,138-39 (JA___, ___-___).  And the price tiers and price caps set the new, higher, uniform prices.  Dkt.326.133 (JA___).  These mechanisms worked as intended: the Publisher-Defendants collectively moved their retailers to agency, *see supra* 26-30, and as soon as the agency agreements took effect, they priced the vast majority of bestsellers and new releases within 1% of the price caps, *see supra* 30-32.

The district court did not rest its conspiracy finding solely or even primarily on specific contract terms or supplier-distributor discussions.  Rather, it relied on other abundant evidence that Apple and the Publisher-Defendants had agreed to fix and raise ebook prices.  The court also relied on the other abundant evidence of conspiracy.  Cue pitched an industry-wide move to agency as "the only way" to get "some level of reasonable pricing," PX-540; Tr. 498:12-16 (JA___-___, ___), and

68

Apple's initial term sheet explicitly required that "all resellers of new titles need to be in agency," Dkt.326.46; PX-41 (JA___, ___).  There was no evidence that Apple ever retreated from the substance of that demand.  Dkt.326.50 (JA___).  Instead, Apple replaced that explicit requirement with the MFN.

Even if Apple had an independent business interest in the MFN, Br. 41-42; Economist Br. 8-9, that would not render the district court's inference of conspiracy implausible.  The fact that the MFN provided Apple some protection in the event the conspiracy failed shows only that Apple successfully transferred some of the risk of the scheme to the Publisher-Defendants.  It does not undermine the evidence that the MFN's primary purpose and effect was to enable the Publisher-Defendants to collectively force the move to agency, without having the agreements explicitly require that "all resellers [be] . . . in agency." *See supra* 15-18.

Also unsound is the contention that the MFN had insufficient economic impact to alter materially the Publisher-Defendants' incentives in dealing with Amazon.  Br. 44; Economist Br. 16-17; WLF Br. 25-27.  Apple's expert, Dr. Klein, failed to account for the

69

preexisting powerful, albeit insufficient, incentive the Publisher-Defendants had to move retailers to agency and off the $9.99 price. Tr. 2131:14-18 (JA___).  The MFN strengthened that incentive, since the Publisher-Defendants were loath to accept the combination of low revenue *and* low retail prices that would result if Apple were on an agency model while Amazon remained on wholesale.  And the collective adoption of the MFN meant that each Publisher-Defendant knew it did not stand alone in dealing with Amazon, who could say no to any one of them but not to all of them.  Dkt.326.88-90 (JA___-___); *see supra* 28-29.

That a non-conspirator could have legally engaged in similar vertical arrangements does not "*compel*[] recognition of ambiguity."  Br. 32; *see also* Br. 20, Economist Br. 7.  "[A]cts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).  It is also well understood that some vertical arrangements, though lawful in and of themselves, may be economically risky or unwise *unless* competitors agree to the same arrangement. *See Toys "R" Us*, 221 F.3d at 935-36.  The existence of such vertical arrangements may thus support an inference of unlawful conspiracy

70

among competitors. In any event, the district court in this case did not infer a horizontal price-fixing conspiracy from the vertical agreements alone, but rather found overwhelming evidence of such a conspiracy in the history and details of the negotiations among Apple and the Publisher-Defendants.

Indeed, the MFN was useful in achieving the conspiracy's ends precisely *because* such clauses without more are generally lawful. If any publisher had signed an agreement with Apple that contained the MFN, and had then continued to sell to Amazon on a wholesale basis (thus allowing Amazon to continue pricing the publisher's ebooks at $9.99), there is every reason to believe that Apple would have actually enforced the MFN against it. Enforcement of the MFN in that circumstance would deprive the publisher of the benefit of Apple's agreement to accept the agency model, and it would give the publisher the worst of both worlds for the reasons set forth above. A legally enforceable MFN was thus a more effective means of ensuring that the Publisher-Defendants would collectively achieve the conspiracy's ultimate objective – moving Amazon to an agency model, with consequent higher retail ebook prices – than an express but likely

71

unenforceable, *see* Dkt.326.49n23 (JA___), contractual requirement that the publishers take that step.

The district court also rightly held that, in determining whether an unlawful conspiracy existed, it is of "no consequence" that each of the parties acted in its own "lawful interest."  Dkt.326.130-31 (quoting *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142 (1966)) (JA___-___).  Apple argues that *Monsanto* and *Matsushita* "clarified" that conduct that is "consistent with the defendant's independent interest" cannot support an inference of conspiracy.  Br. 32-33.  But neither *Matsushita* nor *Monsanto* undermines *General Motors* or the district court's conclusion.

*Matsushita* held that a refusal to deal, standing alone, cannot support liability if the defendant "lack[s] any rational motive" to join a conspiracy to boycott the plaintiff and its refusal to deal with the plaintiff is "consistent with [its] independent interest." *Matsushita*, 475 U.S. at 587.  But it does not follow that a defendant acting in its independent interest can never collude, or that courts must ignore evidence of any conduct that is also in a defendant's independent self-

interest.  Indeed, a defendant may collude because it is the easiest way to achieve that independent interest.

Nor does *Monsanto* require courts to ignore evidence of vertical pricing discussions.  Br. 12, 21-22.  In *Monsanto* itself, the plaintiff's evidence of vertical pricing discussions, in combination with evidence of termination threats and other communications, permitted the inference of conspiracy.  465 U.S at 765-66.  Here, Apple's pricing conversations with the Publisher-Defendants, combined with other evidence of the defendants' collusion, permitted the inference of a conspiracy to raise and fix ebook prices.  Apple told the publishers that its agency contracts would enable them to raise ebook prices, but only if enough publishers agreed.  Apple then provided the publishers with a uniform pricing scheme.  And Apple explained to each publisher, in a chart that expressly referenced the other publishers, how that pricing scheme allowed them to raise ebook prices.  Cue reassured the publishers "that they weren't going to be alone," Tr. 1758:6-15 (JA___), and the publishers reassured one another, *see supra* 24-26.  "Evidence of this kind plainly is relevant and persuasive as to a meeting of minds." *Monsanto*, 465 U.S. at 765.

73

### 4. Apple Unsuccessfully Attacks A Few Bits Of The Totality Of The Evidence, While Ignoring The Rest

It was uncontested below that the Publisher-Defendants all signed agency agreements with Apple within a very brief period of time, that all five moved Amazon to the agency model shortly thereafter, and that all five then raised retail prices to the "price caps" set forth in the agency agreements.  To establish Apple's liability under Section 1, Plaintiffs were required to prove that this conduct reflected an agreement among the publishers (rather than simply parallel independent action), and that Apple joined in that agreement.  The district court properly found "abundant direct and circumstantial evidence" that Apple "knowingly and intentionally participated in and facilitated a horizontal conspiracy to eliminate retail price competition and to raise the retail prices of ebooks."  Dkt.326.129 (JA___).

Apple asserts that the district court improperly characterized some evidence as direct and that the circumstantial evidence is not sufficient to support the court's liability finding.  Br. 34-46.  Although Apple quibbles about how particular pieces of evidence are labeled, the "distinction between direct and circumstantial evidence" is "largely if not entirely superfluous," *In re High Fructose Corn Syrup Antitrust*

74

*Litigation*, 295 F.3d 651, 661-62 (7th Cir. 2002).  An antitrust

conspiracy can be proved through either.  Dkt.326.108 (JA___);

*see Monsanto*, 465 U.S. at 764 (an "antitrust plaintiff should present

direct *or* circumstantial evidence that reasonably tends to prove" the

conspiracy (emphasis added)).  Indeed, circumstantial evidence

sometimes is even "more certain, satisfying and persuasive than direct

evidence." Dkt.326.108 (JA___) (quoting *Desert Palace, Inc. v. Costa*,

539 U.S. 90, 100 (2003)).

In support of their overall contention that Apple participated in a

horizontal price-fixing conspiracy among the Publisher-Defendants,

Plaintiffs put forth evidence and arguments falling into two basic

categories.  First, Plaintiffs introduced copious evidence of extensive

communications among Apple and the Publisher-Defendants during

December 2009 and January 2010.  That evidence showed that Cue

kept each Publisher-Defendant apprised of his conversations with the

*other* publishers; that he encouraged the publishers to discuss Apple's

agency proposal among themselves, and that they engaged in such

conversations; and that he reiterated as his principal sales pitch that

the publishers acting together could accomplish what no publisher could

achieve singly.  Second, Plaintiffs showed that no Publisher-Defendant would have signed the agency agreement with Apple absent an understanding that other publishers would do likewise.  By accepting the MFN in that agreement, each Publisher-Defendant that signed it effectively committed itself to move Amazon to agency as well; yet none of the publishers had shown any prior willingness to take the perilous step of confronting Amazon unilaterally.

Thus, the district court found that Plaintiffs proved concerted action among Apple and the Publisher-Defendants with both direct evidence of the actual communications among the parties and, "as compellingly," circumstantial evidence showing the inherent unlikelihood that the result ultimately achieved could have been accomplished *without* collusion.  Dkt.326.119-20 (JA___-___).

To be sure, not all the evidence of communications among the parties is equally compelling.  For example, Steve Jobs's email to James Murdoch urging HarperCollins to "[t]hrow in with apple and see if we can *all* make a go of this and create a real mainstream ebooks market at $12.99 and $14.99," Dkt.326.81 (JA___) (emphasis added) is particularly probative as it is clearly a plea for concerted action.  But other evidence

76

that points to the same conclusion also counts, for when "consider[ing] the conspiracy evidence," this Court is "mindful that 'the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *United States v. Coplan*, 703 F.3d 46, 63 (2d Cir. 2012) (quoting *Continental Ore*, 370 U.S. at 699). Here, the district court did not use "direct" as a synonym for "strong" or "circumstantial" as a synonym for "weak"; to the contrary, it stated that Plaintiffs' proof of the conspiracy was found "as compellingly, in the circumstantial evidence" as in the direct evidence, Dkt.326.119 (JA___). The court's use of the term "direct" to characterize both highly probative and less probative evidence of the conspirators' interactions therefore does not impugn the court's analysis.

Apple also contends that the district court overstated or misperceived the significance of specific, cherry-picked fragments of the trial record. Those arguments are unpersuasive on their own terms, and they provide no plausible basis for setting aside the court's ultimate liability finding.

77

First, Apple complains that the district court improperly inferred from an "innocuous email," in which Cue complimented Reidy as a "real leader in the book industry," that Reidy had helped convince other Publisher-Defendants to join Apple's price-fixing plan. Br. 36; *see* PX-613; Dkt.326.83 (JA___, ___). But the court's inference was not based on a single email. Cue himself testified that he pitched agency to Reidy, a "real leader," PX-613; Tr. 1975:21-1976:2 (JA___, ___-___), because she was already "holding back books" to push Amazon off the $9.99 price point, Tr. 2042:14-17, 2043:6-9 (JA___, ___). Reidy also discussed with Cue his "progress in herding us cats," PX-782 (JA___), and she called her peers when they were hesitant about joining forces with Apple, *supra* 24-26. At trial, Reidy denied these conversations, but the district court found that the denials were not credible and "in the face of overwhelming evidence to the contrary, strongly support[] a finding of consciousness of guilt." Dkt.326.119n59, 143n66 (JA___, ___); *see also Anderson*, 747 F.3d at 60.

Apple also argues that the district court improperly inferred that "the stumbling block" Macmillan's Sargent mentioned in his January 21 email to Cue was the fact that Apple's MFN required publishers to

move their other retailers to agency.  Br. 37; *see* PX-37; Dkt.326.71n38

(JA___, ___).  But in an email to Jobs later the same day, Cue reported

that Sargent had concerns about the MFN.  PX-42 (JA___).  During his

deposition, moreover, Cue admitted that Macmillan's biggest concerns

were the MFN and the price tiers.  Tr. 1749:4-7 (JA___).  Cue also

remembered discussing the price tiers at dinner with Sargent on

January 20.  *Id.*  At trial, he changed stories, offering non-credible

testimony that he and Sargent discussed only one-off promotions.

Dkt.326.71n38; Tr. 2023:1-7 (JA___, ___).  The district court also

reasonably disbelieved Sargent's claims not to remember this

conversation, which was about "the single large issue" in Macmillan's

negotiations with Apple.  Dkt.326.71n38; Tr. 1122:8-12; PX-37 (JA___,

___, ___).

Apple further contends that the district court misinterpreted an

email from Apple's Steve Jobs to James Murdoch (an executive at

HarperCollins's parent company), in which Jobs "muses about Amazon's

$9.99 price point 'who knows, maybe they are right.'"  Br. 36.  Read in

context, however, the statement "maybe they are right" was simply an

acknowledgment that consumers might refuse to pay more than $9.99

for ebooks.  *See* Dkt.326.150 (JA___) (explaining that the statement
"does nothing to controvert Jobs's intent to raise e-book prices; it simply
indicates his doubts over consumers' reaction to these higher prices");
PX-32 (JA___-___).  Thus, Jobs explained that "we simply don't think
the ebook market can be successful with pricing higher than $12.99 or
$14.99.  Heck, Amazon is selling these books at $9.99, and who knows,
maybe they are right and we will fail even at $12.99.  But we're willing
to try at the prices we've proposed."  Dkt.326.80-81; PX-32 (JA___-___,
___-___).  Neither Jobs's defense of the particular fixed prices that Apple
had proposed, nor his acknowledgment that even those prices might be
higher than the market would bear, casts doubt on the nature of his
proposal as one to fix prices.  Indeed, the same email continued by
encouraging Murdoch to "throw in with [A]pple and see if *we can all
make a go* of this to create a real mainstream ebooks market at $12.99
and $14.99."  Dkt.326.81; PX-32 (JA___, ___) (emphasis added).

Finally, Apple complains that the district court mistakenly inferred
from Sargent's email telling Cue that on the day of the iPad launch
Sargent would "be in Seattle or traveling back" that "Apple knew that
all the publishers would 'demand that Amazon move to an agency

80

model,'" Br. 37; *see* PX-881 (JA___).  But the court inferred from Sargent's email only that "Cue's denial of prior knowledge of Sargent's trip to Amazon was particularly brazen."  Dkt.326.84n47 (JA___); *see* Tr. 1772:24-1773:10 (JA___-___).

To determine that Apple knew the publishers would demand that Amazon move to agency, the district court relied on a broad range of evidence.  Cue admitted at trial that Apple "expected" the move to happen – he denied only "knowing" it, a denial the court found not credible.  Dkt.326.84n47; Tr. 1765:2-25 (JA___, ___).  On the day of the iPad launch, Jobs showed an ebook selling for $14.99 in the iBookstore that sold for $9.99 at Amazon.  Dkt.326.85-86 (JA___-___).  Jobs explained to a reporter that the publishers were "actually withhold[ing] their books from Amazon because they are not happy with the price," but that price would soon be irrelevant because all prices will "be the same."  PX-607 (JA___-___).  Simon & Schuster's general counsel called this statement "incredibly stupid."  *Id.*  Reidy agreed.  Tr. 531:22-24 (JA___).  Jobs also told his biographer the next day – the same day Sargent was meeting with Amazon about the move to agency – that the publishers "went to Amazon and said, 'You're going to sign an agency

contract or we're not going to give you the books'." PX-514 at 503-04 (JA___-___).

* * * * *

The district court properly determined that Apple had participated in a horizontal conspiracy among competing publishers to fix ebook prices, which was *per se* illegal. Apple's efforts to dismember the conspiracy by attacking a few isolated pieces of evidence leave only the definite and firm conviction that no mistake was made; Apple "was a knowing and active member of [the] conspiracy." Dkt.326.113 (JA___). Even when facilitated by vertical contracts, or joined by a vertically-related entity, an agreement among competitors to fix and raise prices is *per se* illegal. Apple orchestrated such an agreement and is liable for it.

## II. Apple's Conduct Is Also Illegal Under The Rule Of Reason

The court correctly determined that, if the *per se* rule did not apply, Apple would still be liable under a rule-of-reason analysis, in which a court evaluates a restraint's impact on competition "by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Prof'l Eng'rs*, 435 U.S. at 692.

82

Apple disparages what it calls the district court's "one-paragraph alternative holding," Br. 54-55; *see also* WLF Br. 11, 21, arguing that it falls short of the "careful and complete analysis" demanded by *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). The district court was not required, however, to repeat in its rule-of-reason analysis its extensive findings on the history, purpose, and effect of the agency agreements that Apple had entered into with the Publisher-Defendants. The court's careful and complete analysis amply supports the conclusion that the anticompetitive effects of the challenged agreements outweighed any procompetitive benefits those agreements might have produced.

The evidence showed that the purpose of the agency agreements was to insulate Apple from retail price competition and allow the Publisher-Defendants to control and collectively raise ebook prices to specified "price caps." *See supra* 18-22. Shortly after the agency agreements with Apple were consummated, the Publishers-Defendants moved Amazon and other ebook retailers to an agency model and immediately raised prices on new releases and bestsellers to the agreed-upon levels.

As the district court found, the scheme "did not promote competition, but destroyed it."  Dkt.326.121 (JA___).

The district court also correctly found that the scheme actually raised prices.  Immediately after switching their retailers to agency, the Publisher-Defendants priced the vast majority of their new releases sold through both Apple and Amazon within 1% of the Apple price caps.  As a result, prices of ebooks sold through Amazon increased an average of 14.2% for New Releases, 42.7% for NYT Bestsellers, and 18.6% across all of their ebooks.  The following chart, which appears at Dkt.326.95 (JA___), is illustrative; prices went up, and they stayed up.  *See also* DX-434; PX-1097¶¶7-10 (JA___, ___-___).



Not surprisingly, given these price increases, the Publisher-Defendants sold fewer ebooks immediately after the switch to agency, even though non-party publisher sales increased during the same time. Dkt.326.97; PX-1105¶70, 1097¶10 (JA___, ___, ___).  This output reduction persisted at least until February 2011.  Dkt.326.122; PX-1097¶53 (JA___, ___).

As Apple anticipated, the Publisher-Defendants also raised the prices of ebooks not covered by Apple's pricing schedule, at least in part to recover revenue lost under the Apple agency agreements. Dkt.326.95-96; Tr. 1949:24-1954:17; PX-894 (JA___-___, ___-___, ___-___).  The Publisher-Defendants also raised the prices of some print books in order to move the ebook version into a correspondingly higher tier.  Dkt.326.95-96; DX-449 (JA___-___, ___).  This is reflected in the following table, prepared by Apple's expert Dr. Burtis, and reproduced in the court's opinion.  *Id.*

Average E-book Prices of Backlist and New Release Titles
in the Periods Before and After Agency

| | Amazon | Barnes & Noble | Sony |
|---|---|---|---|
| **Backlist** | | | |
| Before Agency | $7.16 | $6.84 | $8.07 |
| After Agency | $8.78 | $8.20 | $8.43 |
| Percent Change | 23% | 20% | 4% |
| **Hardcover New Release and NYT Bestsellers** | | | |
| Before Agency | $10.37 | $9.99 | $11.31 |
| After Agency | $12.28 | $11.60 | $11.97 |
| Percent Change | 18% | 16% | 6% |

Thus, as the court found, "consumers suffered in a variety of ways from this scheme to eliminate retail price competition and to raise e-book prices." Dkt.326.98 (JA___). They were forced to pay more for ebooks, to buy cheaper ebooks than the ones they wanted to buy, or to defer purchases altogether. *Id.*

Apple argues that the evidence did not show a market-wide actual adverse effect on competition because, "[w]ith respect to *price*, plaintiffs' experts focused exclusively on price increases for the *publisher defendants'* ebooks." Br. 55 (emphasis in original). Apple misunderstands the law. As this Court has held (and Apple only partially quotes), the plaintiff's burden is to show an "*actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging*, 996 F.2d at 543 (emphasis in original); *see also K.M.B.*

86

*Warehouse Distr., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995). The decisions that Apple invokes simply caution that proof of a plaintiff's own injury, standing alone, does not establish the requisite harm to competition. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004). Here, however, Plaintiffs established not just harm to a specific competitor, but an adverse impact on consumers and on the competitive process.

Although Plaintiffs' experts engaged in detailed analysis of the Publisher-Defendants' prices, they did not ignore the rest of the market. Their evidence established that the Publisher-Defendants' ebooks, comprising about half the market, PX-1105¶36 (JA___), increased in price by nearly 20% on average, PX-1105¶149 (JA___-___). Their evidence also established that the prices of other ebooks remained roughly unchanged. *Id.* Moreover, Apple's expert, Dr. Burtis, acknowledged that the average price for the Publisher-Defendants' ebooks was higher in the two-year period after the agency agreements, Tr. 2235:7-14 (JA___), and that overall, prices went up, Tr. 2236:5-11, 2237:1-2238:5 (JA___-___). Apple cites no decision suggesting that

this evidence is insufficient to show an adverse effect on competition as a whole in the relevant market.

Although Dr. Burtis conceded that ebook prices rose immediately after the introduction of agency, Apple contends that within "just 9 months," ebook prices dropped below pre-agency levels.  Br. 56.  But Apple failed to link any longer-term price effects to the agency agreements.  Dr. Burtis pointed to the difference between average ebook prices in the two-year period before the iBookstore opened and the two-year period after.  In rejecting that analysis, the district court found that the comparison did not control for any changes in the rapidly evolving ebook market during that time, Dkt.326.99 (JA____), such as Amazon's entry into publishing, the greater number of ebook readers on the market, or the different ebook titles available during different periods.

Apple and its amici also argue that the collective price increase was not anticompetitive because prices previously had been too low, and that the district court erroneously "assumed that Amazon's $9.99 was the *best* retail price."  Br. 24 (emphasis in original); *see also* Economist Br. 19-20; Kohn Br. 6, 11, 20.  But the district court's finding of actual

anticompetitive effects does not rest on the assumption that $9.99 was the best price, or that anything above that was necessarily anticompetitive.  Rather, the court recognized (in accordance with fundamental antitrust principles) that retail prices should be set by competition, and it found that the conspiracy had thwarted that process.[13]

There is likewise no merit to the argument that the price increases were beneficial because they resulted from "the disruption of Amazon's monopoly retail position."  Economist Br. 19; *see* WLF Br. 22; Kohn Br. 4-7.  Amazon began losing meaningful share (primarily to Barnes & Noble) well before Apple's entry.  PX-1105¶45.  Furthermore, the

---

[13] Amicus Kohn argues, citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225-26 (1993), that antitrust law focuses on the efficiency of prices.  Kohn Br. 6-8.  But *Brooke Group*, like the decision here, focused on the competitive process, not the efficiency of prices.  509 U.S. at 226.  In any event, the district court here also found that the conspiracy had reduced output, which is a commonly used proxy for efficiency.  *See Broadcast Music*, 441 U.S. at 19-20 (contrasting practices that "decrease output" with those that "increase economic efficiency"); *L.A.P.D., Inc. v. Gen. Elec. Corp.*, 132 F.3d 402, 404 (7th Cir. 1997) (Easterbrook, J.) ("Antitrust law is designed to protect consumers from the higher prices – and society from the reduction in allocative efficiency – that occurs when firms with market power curtail output.").

existence of a fierce competitor cannot justify the suppression of competition. "[T]he argument that . . . special characteristics of a particular industry" justify anticompetitive conduct "is not permitted by the Rule of Reason." *Prof'l Eng'rs*, 435 U.S. at 689-90. "Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *Id.* at 688. Here, that impact was plainly for the worse.

Finally, Apple asserts that purported procompetitive benefits of the conspiracy preclude a finding of liability. But there were no procompetitive benefits, and even if there were, the price-fixing conspiracy was not reasonably necessary to achieve them, *see Insurance Brokerage*, 618 F.3d at 345-46. For example, citing Dr. Burtis's declaration, Apple argues that "after Amazon adopted terms for self-publishers similar to the Apple model . . . the number of self-published ebooks in the market skyrocketed." Br. 57. But Amazon's self-publishing program pre-dated the agency agreements, and Dr. Burtis

90

admitted at trial that she could not link the two.  Tr. 2248:19-2249:7

(JA___-___).

Although Apple preferred not to compete with Amazon on price, it

does not follow that Apple could not, or would not, have entered the

market without a price-fixing conspiracy.  Moerer had developed a

strategy for Apple to enter the ebooks market profitably under the

wholesale model.  PX-39 (JA___).  There is likewise no reason to believe

that the conspiracy prevented widespread, long-lasting, or effective

windowing.  Dkt.326.140 (JA___).  Although Apple suggested that

publishers use a *threat* of windowing new releases to convince Amazon

to sign agency agreements, Dkt.326.142; PX-336 (JA___, ___), the

publishers recognized that *actual* windowing was "entirely stupid," Tr.

1214:16-18, PX-87 (JA___, ___), as they would never make up the lost

sales, PX-427, 578 (JA___, ___); *see also* PX-290, 450 (JA___, ___).  The

publishers who windowed did so for only 37 titles, Dkt.326.141;

Tr. 2066:11-14 (JA___, ___), and there was never any threat from the

publishers to withhold all ebooks.

Apple also lauds the iPad as an e-reader and touts its impact on

innovation and competition, Br. 5, 9, 52-53; WLF Br. 5, but the iPad

was coming with or without the iBookstore, Dkt.326.156; DX-714¶49 (JA___, ___).  Even if Apple had not offered its own e-reader application and bookstore, consumers could have read the same ebooks on the iPad via e-reader applications from Amazon, Barnes & Noble, and others. Tr. 2332:19-2333:10; 2235:12-16 (JA___-___, ___).  And as Apple's Robert McDonald testified, the iBooks app was not meaningfully superior to competing e-reader apps for the iPad.  Dkt.326.156n69; Tr. 2333:11-2335:16, 2340:16-2341:12, 2343:2-2345:14, 2346:22-2349:10 (JA___, ___-___, ___-___, ___-___, ___-___).  Alleging benefits without proving their existence or connection to the conspiracy does not call the district court's rule-of-reason analysis into question.

## III.  The District Court Properly Excluded Unsupported And Undisclosed Opinions From An Apple Expert

In contending below that the conspiracy caused ebook prices to go down, not up, Apple relied heavily on the work of its expert, Dr. Burtis. Her data analysis, which the district court admitted, showed that the average ebook price was lower during the two-year period after the launch of the iBookstore than during the two-year period before the launch.  Dr. Burtis opined that this purported price decline resulted from the agency agreements and Apple's ebook market entry, but she

did not attempt to isolate the impact of the agency agreements on ebook prices or "seek to control for [other] factors." Dkt.326.122n61 (JA___). The district court concluded that Dr. Burtis "did not offer any scientifically sound analysis of the cause for [the] purported price decline," *id.*, and it therefore excluded Dr. Burtis's opinion testimony.

The district court properly held that Apple failed to carry its burden of establishing the admissibility of Dr. Burtis's opinions. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "An expert's conclusory opinions" are not admissible. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). Here, there was "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Apple contends that Dr. Burtis made "an attempt to understand . . . whether or not [she] could attribute" a decrease in agency prices nine

93

months post-agency "to the agency agreements or something else."
Br. 60.  Other than vague references to "data and . . . statistics" and
"explanatory factors," Br. 60-61, however, Apple fails to explain *how*
Dr. Burtis's analysis established a causal link between the agency
agreements and a decrease in ebook retail prices nine months later.
Because the excluded opinions were "connected to existing data only by
the *ipse dixit* of the expert," "nothing . . . require[d the] district court to
admit [them]."  *General Electric*, 522 U.S. at 146.

Contrary to Apple's suggestion, Br. 61, the district court did not
exclude Dr. Burtis's opinions merely because her work did not include a
regression analysis.  Rather, the court excluded those opinions because
Dr. Burtis did not employ or disclose *any* methodology that supported
them.  An economist's opinions on causation that do not follow from her
analysis are properly excluded.  *See Raskin v. Wyatt Co.*, 125 F.3d 55,
67-68 (2d Cir. 1997) (affirming, in age discrimination case, exclusion of
expert report that merely "assume[d] that any anomalies in the . . . data
must be caused by age discrimination, and ma[de] no attempt to
account for other possible causes"); *United States v. Dukagjini*, 326 F.3d
45, 54 (2d Cir. 2003) ("When an expert is no longer applying his

94

extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded.").

Even though the court had excluded her opinions before trial, Dr. Burtis stated on cross-examination that the two-year decrease in average ebook prices was attributable to "agency agreements" and "the entry of Apple." Tr. 2243:11-16 (JA___). On redirect examination, she asserted that Apple's entry and the agency model had "intensified competition and led prices to be lower than they otherwise would have been." Tr. 2307:21-22 (JA___). Because those opinions were essentially identical to those the court had previously excluded from her direct testimony (and were similarly unsupported), the court properly struck them as beyond the scope of her direct testimony.

Apple also asserts, in a footnote, that the district court's exclusion of Dr. Burtis's testimony as previously undisclosed is "belied by the record," in ways Apple does not explain. Br. 59 n.7. "[A]n argument made only in a footnote [is] inadequately raised for appellate review." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Apple appears to refer to Dr. Burtis's statement on cross-examination that the decline in average ebook prices post-agency was "not the result of any

95

preexisting downward trend." Br. 59; Tr. 2209:17-20 (JA___). The court properly excluded this opinion because it had not been disclosed in her expert reports, Tr. 1036:11-19, 2213:22-2215:4 (JA___, ___-___), and a district court has "wide discretion in punishing failure to conform to the rules of discovery," *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988). In any event, that opinion was yet another *ipse dixit*.

Apple also argues that the district court applied a "double-standard" by inviting a government economic expert, Dr. Richard Gilbert, to opine "on the very topic the court barred Dr. Burtis from addressing." Br. 61-62. But the court did not bar Dr. Burtis from testifying about a particular topic; it barred her only from offering unsubstantiated opinions on that topic. If Dr. Gilbert's opinions had been similarly unsubstantiated, Apple could have objected to their introduction on that ground. Apple made no such objection.

Finally, whatever the merits of these challenged exclusions, Apple suffered no prejudice from them. The court admitted all of Dr. Burtis's data and data analysis. As both gatekeeper and factfinder, the court carefully reviewed the opinions that it found unreliable, as well as the underlying data. *See In re Unisys Savings Plan Litig.*, 173 F.3d 145,

96

158 (3d Cir. 1999) (exclusion of expert testimony by judge acting as gatekeeper and factfinder is owed "great deference"); *see also United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008) (a district court's "broad discretion" to exclude expert testimony "is at its zenith during a bench trial"). Apple cannot plausibly claim that admitting opinions that the court had found unreliable – opinions that were only a small part of a large record which "overwhelmingly demonstrates," Dkt.326.131 (JA___), Apple's participation in a price-fixing conspiracy with anticompetitive consequences and no procompetitive benefits – would have changed any of the court's findings of fact or conclusions of law.

## IV.  The Injunction Is Designed To End Apple's Anticompetitive Conduct, Prevent Its Recurrence, And Restore Competition

Remedies in Sherman Act cases should end the unlawful conduct, prevent its recurrence, and eliminate its anticompetitive consequences. *See Prof'l Eng'rs,* 435 U.S. at 697.  The district court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine*

97

*Research, Inc.*, 395 U.S. 100, 132-33 (1969) (internal quotations omitted). Once the government has established a Sherman Act violation, "all doubts as to the remedy are to be resolved in its favor," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961), and those found liable for violating antitrust laws "must expect some fencing in," *Otter Tail Power Co. v. United States*, 410 U.S. 366, 381 (1973) (internal quotations omitted). The district court's Injunction follows those precepts.

1. Apple's brief includes a one-sentence assertion that the restrictions on its ability to discriminate against ebook applications through its Applications (App) Store are unrelated to the conduct at issue below. Br. 62. That "one-sentence argument is insufficient to raise the issue for review before this Court." *Viacom Int'l v. YouTube, Inc.,* 676 F.3d 19, 40 n.14 (2d Cir. 2012).

In any event, the argument lacks merit. The Injunction prohibits discriminating against ebook applications, Dkt.374.IVB (JA___), so that Apple may not use the App Store as "a back doorway for introduction of

an agency agreement."[14]  Dkt.356.63:5-8 (JA___).  Apple created this

concern: Cue attributed Random House's eventual acceptance of agency

(which it had resisted for a year) partly to "the fact that I prevented an

app from Random House from going live in the app store this week."

Dkt.326.101; PX-519 (JA___, ___).  Post-trial, Apple agreed that the App

Store should not be used "as an engine of retaliation."  Dkt.356.63:1-4

(JA___).  Apple argued below that the Injunction should not preclude

general policy changes for the App Store and app developers,

Dkt.356.57:19-21 (JA___), but the Injunction as entered does not do

that, Dkt.374.IVB (JA___).  As the district court explained, the

Injunction is meant to "adequately protect price competition without

touching, in any way, Apple's flexibility in its management of the app

store."  Dkt.356.63:9-11 (JA___).

   2.  Apple and two Publisher-Appellants complain about restrictions

on Apple's contracts with Publisher-Defendants.  Br. 62; S&S Br. 22-43;

Macmillan Br. 28-53.  Apple's opaque one-sentence argument regarding

---

[14] Apple explained that it takes a 30% commission on all digital content sales made directly from its apps.  Dkt.356.62:1-8 (JA___).  The court was concerned that Apple might use that 30% sales commission to introduce a "de facto agency agreement."  Dkt.356.63:5-9 (JA___).

those restrictions is insufficient to bring the issue before this Court. *Viacom,* 676 F.3d at 40 n.14.  The Publisher-Appellants argue about the restrictions at greater length.  Their arguments are flawed, however, because they rest on the erroneous premise that the Injunction entered against Apple had the effect of amending the Publisher-Defendants' own previously entered consent decrees.

The Publisher-Defendants' consent decrees prohibit them, for two years, from entering into contracts that prevent ebook retailers from discounting.  The Injunction bars Apple from entering contracts that restrict its discounting.  The court was concerned about Apple "renegotiating with all of the publisher defendants at once." Dkt.356.65:21-25 (JA___).  It sought to avoid creating "one point in time" when Apple could coordinate the Publisher-Defendants by "assur[ing each] that it was taking the same bargaining position as its peers vis-a-vis Apple."  *Id.*  The court therefore imposed restrictions on Apple that expire at six-month intervals for each Publisher-Defendant, beginning two years after the entry of judgment.  This sensible precaution was within the court's discretion.

Macmillan and Simon & Schuster argue that, because the
Injunction's prohibition on Apple contracts that restrict discounting
lasts longer than similar provisions in the publishers' own consent
decrees, the court effectively amended those consent decrees without
following the required procedures.  S&S Br. 22-38; Macmillan Br. 28-37.
That argument lacks merit.  The conduct for which Apple was held
liable involved the formation of unlawful *agreements*.  In order to
prevent Apple from committing similar violations in the future, the
district court therefore acted appropriately in fashioning an Injunction
that restricts Apple's ability to negotiate certain types of contracts.

By its nature, a restriction on one party's ability to contract will
have spillover effects on potential counter-parties.  That practical
impact on others, however, does not alter the fact that the Injunction by
its terms runs against Apple, not against the Publisher-Defendants.
Macmillan and Simon & Schuster cite no decision supporting their view
that the Injunction effects a constructive amendment of their own
consent decrees.

For essentially the same reason, Macmillan and Simon & Schuster
are wrong in arguing that Plaintiffs should have been judicially

estopped from "seeking an extension of [the publishers'] cooling-off period." S&S Br. 38; Macmillan Br. 40. Although the relief sought (and the relief ultimately imposed) against Apple will have a practical impact on the Publisher-Appellants, Plaintiffs did not seek any extension of the Publisher-Defendants' own cooling-off periods. Plaintiffs did seek a five-year cooling off period for Apple, but the court rejected that proposal. And it was the court (*sua sponte*), not Plaintiffs, that proposed staggered renegotiation.

3. Finally, Apple argues that the monitorship is "legally inappropriate here." Br. 63. The appointment of a compliance monitor was within the district court's "large discretion to fit the decree to the special needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (internal quotations omitted). Courts have "inherent" authority to appoint persons to assist them, *Ex Parte Peterson*, 253 U.S. 300, 312-13 (1920), including administrators to aid in remedying violations of the law, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481-82 (1986) (affirming appointment of administrator with "broad powers to oversee [union's] membership practices" even though such oversight could "substantially interfere

with . . . membership operations"). The district court was reluctant to impose a monitor. It concluded, however, that given Apple's conduct, defense of that conduct, and reluctance to prevent its recurrence, a monitor was necessary.

Apple forfeited the arguments that formed the basis of its stay request – that the monitorship violates Rule 53, Fed. R. Civ. P., and the constitutional separation of powers, Br. 63 – by "devot[ing] only a single conclusory sentence" to those contentions, *Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir. 2005). Apple also forfeited any argument that the monitorship violates Rule 53 by first raising it two months after noticing its appeal. *See* Opposition of Plaintiffs-Appellees to Apple's Emergency Motion for a Stay Pending Appeal, Jan. 24, 2014, at 10-11. Even if Rule 53 were the only source of the court's authority (and it is not), the monitorship does not violate the rule, as the monitor has authority only to evaluate the effectiveness of Apple's antitrust training and compliance programs. *Id.* at 11-12.

Nor does the monitorship violate the separation of powers. *Id.* at 13-14. Apple's reliance on *Cobell v. Norton* is misplaced, since the district court in that case gave a monitor "license to intrude into the

103

internal affairs" of an executive branch agency.  334 F.3d 1128, 1143 (D.C. Cir. 2003).  In contrast, a district court's appointment of a monitor to ensure that a non-governmental corporation complies with that court's order does not implicate the separation of powers.  *See Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 796 (1987) ("The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches.").

## CONCLUSION

The district court's judgment and injunction should be affirmed.

Respectfully submitted.

May 27, 2014

_/s/ Finnuala K. Tessier_

WILLIAM J. BAER
   *Assistant Attorney General*

MARK W. RYAN
LAWRENCE E. BUTERMAN
DANIEL MCCUAIG
   *Attorneys*
   U.S. Department of Justice
   Antitrust Division

KRISTEN C. LIMARZI
ROBERT B. NICHOLSON
DAVID SEIDMAN
FINNUALA K. TESSIER
   *Attorneys*
   U.S. Department of Justice
   Antitrust Division
   950 Pennsylvania Ave. NW Room 3224
   Washington, DC 20530-0001
   202-305-7420

**For Plaintiff United States**

_/s/ W. Joseph Nielsen_

GEORGE JEPSEN
   *Attorney General of Connecticut*

W. JOSEPH  NIELSEN
   *Assistant Attorney General*
   Office of Attorney General of Connecticut
   55 Elm Street
   Hartford, CT 06106
   860-808-5033

**For Plaintiff-States**

_/s/ Andrew Oldham_

GREG ABBOTT
   *Attorney General of Texas*

DANIEL T. HODGE
   *First Assistant Attorney General*

JOHN SCOTT
   *Deputy Attorney General*

JONATHAN F. MITCHELL
   *Solicitor General*

ANDREW OLDHAM
   *Deputy Solicitor General*

_/s/ Won S. Shin_

ERIC T. SCHNEIDERMAN
   *Attorney General of the State of New York*

WON S. SHIN
   *Assistant Solicitor General*
   Office of Attorney General of New York
   120 Broadway, 25th Floor
   New York, NY 10271
   212-416-8808

**For Plaintiff State of New York**

JOHN T. PRUD'HOMME
KIM VAN WINKLE
ERIC LIPMAN
   *Assistant Attorneys General*
   Office of Attorney General of Texas
   P.O. Box 12548
   Austin, TX 78711-2548
   512-463-1579

**For Plaintiff-States**

## CERTIFICATE OF COMPLIANCE

1. On May 16, 2014, this Court granted Plaintiffs' motions for leave to file an oversize brief up to 20,000 words. This brief contains 19,236 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 with 14-point New Century Schoolbook font.

May 27, 2014                                     /s Finnuala K. Tessier
                                                            *Attorney*

## CERTIFICATE OF SERVICE

I, Finnuala K. Tessier, hereby certify that on May 27, 2014, I electronically filed the foregoing [Page Proof] Joint Brief for Plaintiffs-Appellees United States of America and Plaintiff-States with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the CM/ECF System. I also sent six (6) copies to the Clerk of the Court by Federal Express.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

May 27, 2014                                    /s Finnuala K. Tessier
                                                        *Attorney*